[No. S035032. Dec. 8, 1994.]

Conservatorship of the Person and Estate of SUSAN T.
LAKE COUNTY MENTAL HEALTH DEPARTMENT, Petitioner and
Respondent, v.
SUSAN T., Objector and Appellant.

COUNSEL

David B. Harrison, under appointment by the Supreme Court, and Mat Zwerling for Objector and Appellant.

Carmela F. Simoncini and Joe Simanek as Amici Curiae on behalf of Objector and Appellant.

Cameron L. Reeves, County Counsel, Richard H. Magnuson and J. Ross Walker, Deputy County Counsel, for Petitioner and Respondent.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Ronald E. Niver and Clifford K. Thompson, Deputy Attorneys General, John J. Meehan, District Attorney (Alameda), William M. Baldwin, Assistant District Attorney, and Anthony Douglas, Deputy District Attorney, as Amici Curiae on behalf of Petitioner and Respondent.

OPINION

**WERDEGAR, J.**—After investigating a treating physician's report that Susan T.[1] was a schizophrenic and a danger to herself and to others, the Lake County Mental Health Department (department) dispatched a crisis services worker to Susan T.'s home. She was living amidst bagged human and animal waste, without water, heat or electricity. She was taken to a psychiatric hospital. Several hours later, another mental health worker from the department took photographs of the interior of Susan T.'s apartment. These photographs recorded the conditions under which Susan T. had been living. The photographs were admitted into evidence over Susan T.'s objection at a later conservatorship proceeding brought against her by the public guardian. We granted review to determine whether the exclusionary rule applies to the trial of a proposed conservatee's grave disability in a conservatorship proceeding under the Lanterman-Petris-Short Act, Welfare and Institutions Code section 5000 et seq.[2] Guided by the analyses of both our earlier decisions and those of the United States Supreme Court, we decline to extend the rule to these types of proceedings.

## I. THE LANTERMAN-PETRIS-SHORT ACT

The Lanterman-Petris-Short Act (the act) governs the involuntary treatment of the mentally ill in California. Enacted by the Legislature in 1967,

---

[1]We have abbreviated Susan T.'s name to protect her privacy. (See Welf. & Inst. Code, § 5325.1, subd. (b).)

[2]All further unlabelled statutory references are to the Welfare and Institutions Code.

the act includes among its goals ending the inappropriate and indefinite commitment of the mentally ill, providing prompt evaluation and treatment of persons with serious mental disorders, guaranteeing and protecting public safety, safeguarding the rights of the involuntarily committed through judicial review, and providing individualized treatment, supervision and placement services for the gravely disabled by means of a conservatorship program. (§ 5001.) The act limits involuntary commitment to successive periods of increasingly longer duration, beginning with a 72-hour detention for evaluation and treatment (§ 5150), which may be extended by certification for 14 days of intensive treatment (§ 5250); that initial period may be extended for an additional 14 days if the person detained is suicidal. (§ 5260.) In those counties that have elected to do so, the 14-day certification may be extended for an additional 30-day period for further intensive treatment. (§ 5270.15.) Persons found to be imminently dangerous may be involuntarily committed for up to 180 days beyond the 14-day period. (§ 5300.) After the initial 72-hour detention, the 14-day and 30-day commitments each require a certification hearing before an appointed hearing officer to determine probable cause for confinement unless the detainee has filed a petition for the writ of habeas corpus. (§§ 5256, 5256.1, 5262, 5270.15, 5275, 5276.) A 180-day commitment requires a superior court order. (§ 5301.)

The act authorizes the appointment of a conservator for up to one year for a person determined to be gravely disabled as a result of a mental disorder and unable or unwilling to accept voluntary treatment.[3] (§ 5350.) The proposed conservatee is entitled to demand a jury trial on the issue of his or her grave disability, and has a right to counsel at trial, appointed if necessary. (§§ 5350, 5365.) ■ The party seeking imposition of the conservatorship must prove the proposed conservatee's grave disability beyond a reasonable doubt and the verdict must be issued by a unanimous jury. (*Conservatorship of Roulet* (1979) 23 Cal.3d 219 [152 Cal.Rptr. 425, 590 P.2d 1].)

## II. FACTS

At the time these proceedings were instituted against her, Susan T. was 48 years old and living alone in a detached studio apartment in Nice, California. She had a history of hospitalization for schizophrenia. In October of 1991 her general physician, Dr. Bradley, wrote to the department expressing grave concern about Susan T.'s physical and mental health. He stated that Susan T. was a schizophrenic and a danger to herself and to anyone around her and that she needed to be hospitalized. In response to Dr. Bradley's letter, the

---

[3]"Gravely disabled," as relevant to this case, is defined as "unable to provide for . . . basic personal needs for food, clothing, or shelter." (§ 5008, subd. (h)(1)(A).)

department instituted an investigation into Susan T.'s situation. After speaking with family members who expressed concern over Susan T.'s ability to care for herself, the department sent a crisis worker to interview Susan T. at her home. The interview was terminated when Susan T. became combative, loud and agitated. She was taken to a psychiatric facility by the Lake County Sheriff under section 5150. Both the crisis worker and the sheriff's deputy described the apartment as filthy, with trash and human and animal waste stored in plastic bags around the house.

Several hours after Susan T. was taken into custody, a department employee was instructed to go to Susan T.'s apartment and "take some pictures as evidence." The employee, Bonnie Taylor, explained to the property manager that Susan T. had been taken to the hospital, and she needed to know if Susan T. "had anything important in there" because "if any of her belongings are there[,] then we are responsible for those being taken care of while she was hospitalized." Bonnie Taylor was let into Susan T.'s apartment by the manager and then took nine Polaroid photographs of its interior.

On November 11, 1991, the Public Guardian for Lake County filed a petition for appointment of conservator of the person and estate of Susan T. under section 5352. A temporary conservator was appointed on November 14, and the issue of Susan T.'s grave disability was tried to a jury on December 23 and 24.

After presenting testimony from a psychiatrist who had evaluated Susan T. and interviewed the psychiatric staff who had been treating her, counsel for the public guardian called Bonnie Taylor, the employee who had taken the photographs of Susan T.'s residence. She stated she was a "licensed psych tech" and the continuing care supervisor for Lake County, providing placement and medication services for hospitalized clients. She testified she was informed Susan T. had been taken into custody from her home and hospitalized on a 72-hour hold and that she "was to go out and take some pictures." She further testified she explained to the property manager who she was and that she needed to know if there "was anything important" in Susan T.'s residence, as the department was responsible for her belongings while she was hospitalized. The manager admitted her to Susan T.'s apartment and she took nine photographs of the interior. Those photographs were admitted into evidence over the objection of Susan T.'s counsel. Ms. Taylor briefly summarized the subject of each photograph, which depicted: (1) a corner of the kitchen area, with a pile of large green trash bags in the corner; (2) a sleeping area, with an accumulation of small toys and boxes in the corner; (3) a corner of the kitchen, showing the stove and counter; (4) the bathroom, showing rocks in the sink; (5) newspapers with dog excrement on

them, a pile of large green trash bags, and old cereal bowls with dried cereal in them; (6) the shower, with rocks over the drain; (7) another view of the sleeping area, showing dog excrement and bowls of cereal adjacent to the rumpled blankets; (8) a corner of the apartment, showing 10 to 12 large green trash bags and dog excrement on newspapers; and (9) another view of the sleeping area.

After hearing additional testimony from the property manager and from Susan T. herself, the jury found Susan T. gravely disabled within the definition of the act, and the court appointed the county's public guardian as her conservator. Susan T. appealed, contending the trial court erred in denying her motion to suppress the testimony of Bonnie Taylor, as well as the photographs she had taken.[4] A majority of the Court of Appeal concluded: Bonnie Taylor's entry into Susan T.'s home violated the Fourth Amendment; the exclusionary rule should apply to a conservatorship proceeding under the act; and the trial court should have granted the motion to suppress. The court, however, affirmed the judgment, concluding the jury "could and doubtless would" have found Susan T. gravely disabled on the basis of other, properly obtained evidence, including the testimony of Susan T. herself. The dissenting justice concurred in the result, but did not agree with the majority's conclusion the exclusionary rule should be applied in proceedings under the act. The department petitioned for review, contending Bonnie Taylor's entry into Susan T.'s home did not violate the Fourth Amendment and, even if it did, we should not apply the exclusionary rule to proceedings under the act. We granted review.[5]

### III. DISCUSSION

■ The federal exclusionary rule, when it applies, requires the suppression of evidence seized in violation of the Fourth Amendment to the

---

[4]Susan T. also contended on appeal that the trial court had erred in instructing the jury that the willingness and ability of friends and relatives to assist a proposed conservatee could not be considered unless the offer of such assistance was in writing. The Court of Appeal concluded the instruction was mandated by section 5350, subdivision (e)(2), and rejected the argument the statute impermissibly infringed a proposed conservatee's constitutional right to place relevant evidence before the jury. It further noted the general irrelevance of the instruction to this case, in which there was virtually no evidence—either from any third party or from Susan T. herself—of the availability of such assistance. Neither party has requested that we consider this issue, and we consequently express no opinion on it.

[5]Susan T. is no longer in a conservatorship. She argues we should dismiss the department's petition as improvidently granted because the issues raised in it have been mooted by the termination of her conservatorship. Because a conservatorship is relatively brief (one year) in comparison with the appellate process, we find it likely that this issue—the application of the exclusionary rule to a conservatorship proceeding under the act—is one capable of recurring, yet of evading review because of mootness. We therefore conclude it is appropriate to address the issue in this case. (See *Conservatorship of Manton* (1985) 39 Cal.3d 645, 647, fn. 1 [217 Cal.Rptr. 253, 703 P.2d 1147].)

Constitution of the United States. (*Mapp* v. *Ohio* (1961) 367 U.S. 643, 648 [6 L.Ed.2d 1081, 1086, 81 S.Ct. 1684, 84 A.L.R.2d 933]; *Weeks* v. *United States* (1914) 232 U.S. 383 [58 L.Ed. 652, 34 S.Ct. 341], overruled on other grounds in *Elkins* v. *United States* (1960) 364 U.S. 206 [4 L.Ed.2d 1669, 80 S.Ct. 1437].) The rule has been described by the court that created it as the subject of warm debate, "unaided, unhappily, by any convincing empirical evidence on the effects of the rule [itself]." (*United States* v. *Janis* (1975) 428 U.S. 433, 446 [49 L.Ed.2d 1046, 96 S.Ct. 3021 (*Janis*).) Its primary purpose, if not its sole purpose, has been said to be to " 'deter future unlawful police conduct.' " (*Ibid.*) Although once described as an essential part of the guarantees of the Fourth Amendment (*Mapp* v. *Ohio, supra,* 367 U.S. 643, 657 [6 L.Ed.2d 1081, 1091]), the rule has more recently been characterized as a "judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." (*United States* v. *Calandra* (1974) 414 U.S. 338, 348 [38 L.Ed.2d 561, 571, 94 S.Ct. 613], quoted with approval in *United States* v. *Leon* (1984) 468 U.S. 897, 906 [82 L.Ed.2d 677, 687-688, 104 S.Ct. 3405].)

▮▮▮ Whether the exclusionary rule bars the admission of evidence in a civil proceeding depends, first, on the existence of a search or seizure that violates the protections of the Fourth Amendment of the federal Constitution. In this case, the trial court rejected application of the exclusionary rule to conservatorship proceedings with little argument and no express ruling on the question whether an unlawful search in fact occurred. On appeal, the department argued only that the exclusionary rule should not apply, thereby impliedly conceding a search occurred. Before us, however, the department contends variously that Bonnie Taylor's entry into the home was not a search, that if it was a search it was justified by exigent circumstances and therefore not unreasonable, and that it was, in any event, authorized by section 5156.[6]

These arguments are not properly before us. As indicated, in its brief before the Court of Appeal the department argued only that the exclusionary rule should not apply to proceedings under the act. The argument assumes the department's conduct violated the Fourth Amendment, leaving open only the question of whether the evidence seized in the course of the unlawful search should be suppressed. The first time the department argued Bonnie

---

[6]Section 5156 provides, in relevant part, that unless the detainee's personal property is left in the possession of a responsible relative or guardian, at the time of the detention or within a reasonable time thereafter, the peace officer or other person effecting the detention must take "reasonable precautions to preserve and safeguard the personal property in the possession of or on the premises occupied by the person [detained]."

Taylor's entry into Susan T.'s home was lawful was in its petition for rehearing. ■ "It is a fundamental rule of appellate practice that an appellate court need not consider issues raised for the first time by a petition for rehearing." (*Brown* v. *Superior Court* (1982) 137 Cal.App.3d 778, 782 [187 Cal.Rptr. 324]; *County of Imperial* v. *McDougal* (1977) 19 Cal.3d 505, 513 [138 Cal.Rptr. 472, 564 P.2d 14]; see also, Cal. Rules of Court, rule 29(b)(1) [as a matter of policy, on petition for review we normally will not consider any issue that could have been but was not timely raised in the briefs filed in the Court of Appeal].)

■ We note, moreover, the department's arguments are not supported by the record. The department's argument that Ms. Taylor's entry was not an illegal search is premised on the obligation imposed on it by section 5156 to safeguard and secure the property of persons detained under section 5150; the department contends Bonnie Taylor was dispatched to Susan T.'s home to secure her property. What the department does not expressly argue, but what we imply from its argument, is that, were Ms. Taylor's entry into Susan T.'s home pursuant to the department's authority under section 5156, that entry would fall within the inventory search exception to the warrant requirement of the Fourth Amendment under the authority of *Colorado* v. *Bertine* (1987) 479 U.S. 367 [93 L.Ed.2d 739, 107 S.Ct. 738] and *South Dakota* v. *Opperman* (1976) 428 U.S. 364 [49 L.Ed.2d 1000, 96 S.Ct. 3092]. We need not consider whether the concept of the inventory search, heretofore limited to vehicles lawfully impounded and the personal effects of arrestees, should be extended to a person's home, because the record before us does not support the conclusion Ms. Taylor's entry into Susan T.'s home was for the purpose of securing her possessions.

Ms. Taylor testified she was "informed that [Susan T.] ha[d] been taken from her house and that I was to go out and take some pictures as evidence." Although Ms. Taylor gained entry to Susan T.'s apartment by explaining to the property manager her obligations under section 5156, there is no evidence in the record she did *in fact* secure any of Susan T.'s personal possessions, that any such possessions needed to be secured, or that the department had any reason to believe, from the report of the caseworker, the sheriff's deputy or otherwise, that Susan T. had any possessions that needed securing. The photographs she took were not of property that might have some value and, thus, need to be secured, but recorded instead the general disorder of the apartment, the bags of excrement, and rocks in the sinks and shower.[7] Nor is there any evidence Ms. Taylor prepared and furnished to the court, as required by section 5156, a report describing the property she

---

[7]The labels on the photographs themselves dispel any notion that the photographs were meant to inventory Susan T.'s possessions: "trash in kitchen," "sleeping area," "kitchen stove

secured and the steps she took to secure it. The inventory search cases further indicate that, to survive constitutional scrutiny, the agency conducting the inventory must be operating according to "standardized criteria." (See *Colorado* v. *Bertine, supra,* 479 U.S. at p. 374, fn. 6 [93 L.Ed.2d at p. 747], and cases cited therein.) The department failed to introduce any evidence it has standardized criteria for securing a detainee's property under section 5156 and, consequently, made no effort to demonstrate how the photos that were taken might have fallen within the scope of such criteria.

We are left with a record establishing that a government official entered a private home with neither statutory authorization nor a warrant, and in the absence of any demonstrable exigent circumstances, for the sole purpose of photographing the interior of the home to obtain evidence of the householder's mental disability. ■ We have stated that a " 'search' is a governmental intrusion upon, or invasion of, a citizen's personal security in an area in which he has a reasonable expectation of privacy." (*People* v. *Mayberry* (1982) 31 Cal.3d 335, 341 [182 Cal.Rptr. 617, 644 P.2d 810].) Although the issue was not litigated below, under the facts presented we would have no difficulty concluding Bonnie Taylor's entry into Susan T.'s home constituted a search under the Fourth Amendment.[8] ■ Assuming, therefore, without deciding, a search violating the Fourth Amendment occurred, we proceed to determine whether the exclusionary rule should be applied in a conservatorship proceeding under the act.

"In the complex and turbulent history of the [exclusionary] rule, the [United States Supreme] Court never has applied it to exclude evidence from a civil proceeding, federal or state." (*Janis, supra,* 428 U.S. 433, 447 [49 L.Ed.2d 1046, 1057].) The court has applied the rule in a forfeiture action. (*One 1958 Plymouth Sedan* v. *Pennsylvania* (1965) 380 U.S. 693 [14 L.Ed.2d 170, 85 S.Ct. 1246].) It did so on the theory that a forfeiture, although technically a civil proceeding, is in substance and effect a criminal one and subject to the jurisprudence of the Fourth Amendment. "[A] forfeiture proceeding is quasi-criminal in character. Its object, like a criminal proceeding, is to penalize for the commission of an offense against the law." (*Id.* at p. 700 [14 L.Ed.2d at p. 175].) This court had reached the same conclusion a year earlier in *People* v. *One 1960 Cadillac Coupe* (1964) 62 Cal.2d 92, 96-97 [41 Cal.Rptr. 290, 396 P.2d 706], under nearly the same reasoning:

---

area," "bathroom [¶] rocks in sink," "sleeping room," "rocks in shower," "bed in corner," "trash in living area," "sleeping area."

[8]Susan T. argues the search violated her expectation of privacy not just under the Fourth Amendment but also under article I, section 1, of the state Constitution ("[a]ll people are by nature free and independent and have inalienable rights" including "privacy"). To identify another source of the right to privacy does not appear to affect the analysis of the issue before us, namely, whether a violation of that right triggers the exclusionary rule.

"Whatever the label which may be attached to the proceeding, it is apparent that the purpose of the forfeiture is deterrent in nature and that there is a close identity to the aims and objectives of criminal law enforcement. On policy the same exclusionary rules should apply to improper state conduct whether the proceeding contemplates the deprivation of one's liberty or [one's] property."

We find no similarity between the aims and objectives of the act and those of the criminal law. What we have said of commitment proceedings for the mentally retarded (§§ 6500-6513) is equally true of conservatorship proceedings under the act: "The commitment is not initiated in response, or necessarily related, to any criminal acts; it is of limited duration, expiring at the end of one year and any new petition is subject to the same procedures as an original commitment [citation]; the petitioner need not be a public prosecutor . . . . The sole state interest, legislatively expressed, is the custodial care, diagnosis, treatment, and protection of persons who are unable to take care of themselves and who for their own well being and the safety of others cannot be left adrift in the community. The commitment may not reasonably be deemed punishment either in its design or purpose. It is not analogous to criminal proceedings." (*Cramer* v. *Tyars* (1979) 23 Cal.3d 131, 137 [151 Cal.Rptr. 653, 588 P.2d 793]; see also *Conservatorship of Baber* (1984) 153 Cal.App.3d 542, 550 [200 Cal.Rptr. 262] ["[a] conservatorship proceeding is not a prosecution for a particular act, but an attempt to determine a condition which is subject to change"].)

The Supreme Court has considered the propriety of applying the exclusionary rule in civil proceedings in two subsequent cases, *Janis, supra*, 428 U.S. 433, and *INS* v. *Lopez-Mendoza* (1983) 468 U.S. 1032 [82 L.Ed.2d 778, 104 S.Ct. 3479] (*Lopez-Mendoza*). In both cases, the court shifted its focus from the nature of the proceeding and the extent to which it mirrored the aims and objectives of a criminal proceeding, to an inquiry that balanced the deterrent effect of the rule with its social cost. In both, it concluded the social cost of applying the rule outweighed its deterrent effect.

In *Janis, supra*, 428 U.S. 433, the court considered whether evidence seized by a state criminal law officer in good faith, but nonetheless in violation of the Fourth Amendment, was admissible in a counterclaim for an unpaid tax assessment brought on behalf of the Internal Revenue Service in response to a taxpayer's suit for a refund. The court rejected the argument the deterrent purpose of the rule would be furthered by its application in this federal tax proceeding. Even assuming the rule's deterrent effect on the state police officers who conducted the illegal search, the court nevertheless concluded "the additional marginal deterrence provided by forbidding a

different sovereign [the United States government] from using the evidence in a civil proceeding surely does not outweigh the cost to society of extending the rule to that situation." (*Id.* at pp. 453-454 [49 L.Ed.2d at p. 1060].) That cost, quite clearly, is the suppression of "what concededly is relevant evidence." (*Id.* at pp. 448-449 [49 L.Ed.2d at p. 1058].)

In *Lopez-Mendoza, supra,* 468 U.S. 1032, the court considered whether the exclusionary rule should be applied in deportation proceedings. It cited *Janis, supra,* 428 U.S. 433, as setting forth "a framework for deciding in what types of proceeding application of the exclusionary rule is appropriate. Imprecise as the exercise may be, the Court recognized in *Janis* that there is no choice but to weigh the likely social benefits of excluding unlawfully seized evidence against the likely costs. On the benefit side of the balance 'the "prime purpose" of the [exclusionary] rule, if not the sole one, "is to deter future unlawful police conduct." ' [Citations.] On the cost side there is the loss of often probative evidence and all of the secondary costs that flow from the less accurate or more cumbersome adjudication that therefore occurs." (*Lopez-Mendoza, supra,* 468 U.S. at p. 1041 [82 L.Ed.2d at p. 787], first brackets in original.) Applying this balancing test to deportation proceedings, the court concluded that, although the deterrent effect of applying the exclusionary rule would be greater in *Lopez-Mendoza* than it was in *Janis, supra,* 428 U.S. 433, because the agency that effected the unlawful arrest also brought the subsequent deportation action, the particular nature of a deportation proceeding made the social costs much greater as well.

Our decisions have tended to follow the same paradigm: we focused initially on the nature of the proceedings in which the rule was sought to be applied and, later, consistent with the decisions of the United States Supreme Court, shifted our inquiry to whether the deterrent effect of the rule outweighed its cost. Like the United States Supreme Court, we too have never extended the rule to exclude evidence from civil proceedings, but "only to proceedings so closely identified with the aims of criminal prosecution as to be deemed 'quasi criminal.' " (*In re Lance W.* (1985) 37 Cal.3d 873, 892 [210 Cal.Rptr. 631, 694 P.2d 744].) Thus, as we noted above, we had little hesitation in applying the exclusionary rule to civil forfeiture proceedings, finding in those proceedings "a close identity to the aims and objectives of criminal law enforcement." (*People v. One 1960 Cadillac Coupe, supra,* 62 Cal.2d 92 at p. 96.) We also applied the rule to narcotics addict commitments, finding in those proceedings as well a "close identity to the aims and objectives of criminal law enforcement." (*People v. Moore* (1968) 69 Cal.2d 674, 682 [72 Cal.Rptr. 800, 446 P.2d 800], overruled on other grounds in *People v. Thomas* (1977) 19 Cal.3d 630 [139 Cal.Rptr. 594, 566 P.2d 228].)

Although commitment under the narcotics addict scheme is broadly analogous to involuntary civil commitment for mental disability, the aims and objectives of the two types of proceedings are quite dissimilar. The narcotics addict commitment is essentially in lieu of criminal prosecution for narcotics possession: "The legislation establishing a program of civil commitment of narcotics addicts . . . provide[s] two distinct commitment procedures, ostensibly differentiating between 'Persons Charged with a Crime' . . . and 'Persons not Charged with a Crime'[; however] it appears that in practice the distinction actually observed is between persons who have been brought to trial *and 'convicted'* . . . and those who have not." (*People* v. *Victor* (1965) 62 Cal.2d 280, 289 [42 Cal.Rptr. 199, 398 P.2d 391], fn. omitted, italics in original.) As we explained in a footnote, "in numerous instances the addict has come to the attention of the authorities by being arrested and charged with a crime (e.g., illegal possession of narcotics), but the charge has subsequently been dropped and commitment proceedings have been instituted under [the 'Persons not Charged with a Crime'] article . . . ." (*Id.* at p. 289, fn. 3.) Imposition of a conservatorship under the act, by contrast, is not dependent on either a charged or uncharged criminal act.

More recently, in both *In re Martinez* (1970) 1 Cal.3d 641 [83 Cal.Rptr. 382, 463 P.2d 734], certiorari denied 400 U.S. 851 [27 L.Ed.2d 88, 91 S.Ct. 71], (concluding rule should not be applied in parole revocation proceedings) disapproved on other grounds in *In re Tyrell J.* (1994) 8 Cal.4th 68 [32 Cal.Rptr.2d 33, 876 P.2d 519], and *Emslie* v. *State Bar* ((1974) 11 Cal.3d 210 [113 Cal.Rptr. 175, 520 P.2d 991] (concluding rule inapplicable in State Bar attorney disciplinary proceedings), we focused not on whether the proceedings in which the rule was sought to be applied had a close identity with the aims and objectives of law enforcement, but whether the deterrent effect of the rule outweighed its social cost. In neither case did we find the deterrent effect of the rule outweighed its social cost.[9]

We turn, then, to the question presented by this case: should we apply the exclusionary rule to conservatorship proceedings under the act? Following

---

[9]Relying on principles articulated in our decisions, the Court of Appeal has generally rejected application of the exclusionary rule in noncriminal proceedings, finding it inapplicable in juvenile dependency proceedings, high school disciplinary proceedings and teacher-dismissal proceedings. (See *In re Robert P.* (1976) 61 Cal.App.3d 310, 321 [132 Cal.Rptr. 5], and *In re Christopher B.* (1978) 82 Cal.App.3d 608 [147 Cal.Rptr. 390] [declining to apply the rule to juvenile dependency proceedings, finding the potential of harm to the children in allowing them to remain in an unhealthy environment outweighed any deterrent effect resulting from its application; *Gordon J.* v. *Santa Ana Unified School Dist.* (1984) 162 Cal.App.3d 530 [208 Cal.Rptr. 657] [finding potential for harm to other students, teachers and parents if rule were applied weighed against its application in a disciplinary proceeding against a high school student]; and *Governing Board* v. *Metcalf* (1974) 36 Cal.App.3d 546 [111 Cal.Rptr. 724, A.L.R.4th 2335] [rejecting application of rule in a teacher-dismissal proceeding, finding its application would have little deterrent effect because the search would generally be conducted by an officer who would not know evidence seized might be used in

the lead of the decisions of the Supreme Court, we consider first the extent to which application of the rule would deter the type of misconduct alleged in this case—a mental health worker's unauthorized entry into the residence of a person detained under section 5150. We have recognized that, at least as a theoretical matter, the deterrent effect of the rule is at its greatest when, as is true here, the government agency that effected the search is the same agency (as a practical matter) that seeks to introduce the fruits of its search at trial. (See *Lopez-Mendoza, supra,* 468 U.S. 1032; *Emslie* v. *State Bar, supra,* 11 Cal.3d 210.) There is, however, substantial reason to doubt the actual deterrent effect is, in cases such as this, anything more than theoretical.

The deterrent value of the rule is at its greatest when the fruits of the search will be required in evidence at a proceeding to which the rule applies. Hence, the police officer, engaged in the task of investigating criminal activity, knows the fruits of his or her labor will be used, if at all, in a criminal prosecution in which the exclusionary rule will be applied. When, however, use of the fruits of the search in a proceeding to which the rule applies is less certain, the deterrent effect of the rule is proportionately weaker. Certainly not every detention under section 5150 leads to a conservatorship proceeding; indeed, the act itself is designed to ensure that conservatorship proceedings are brought as a last resort, when voluntary treatment has been refused and the temporary involuntary treatment provisions of

---

a subsequent civil dismissal proceeding, and relying as well on special protection to which children are entitled under state law].)

The rule has been held applicable in one type of disciplinary proceeding before the State Personnel Board (*Dyson* v. *State Personnel Bd.* (1989) 213 Cal.App.3d 711 [262 Cal.Rptr. 112] [concluding deterrent effect of rule weighed in favor of its application to a disciplinary proceeding against a counselor in a juvenile facility, because the officers who conducted the search were employees of the specific agency that both searched the counselor's home for stolen property and prosecuted the resulting disciplinary proceeding against him]), but not in another (see *Finkelstein* v. *State Personnel Bd.* (1990) 218 Cal.App.3d 264 [267 Cal.Rptr. 133], petn. for review den. May 17, 1990 [concluding the exclusionary rule should not be applied to a disciplinary proceeding before the State Personnel Board because, although person performing the search was employee of prosecuting agency, the search was not conducted to uncover employee misconduct, but rather to ensure all confidential documents in office were properly boxed for move; hence, application of exclusionary rule would not have deterred search]).

The majority of cases considering its application in medical licensing proceedings have refused to apply it. (See *Pierce* v. *Board of Nursing etc. Registration* (1967) 255 Cal.App.2d 463 [63 Cal.Rptr. 107] [expressing some doubt as to whether the rule would apply to revocation of a nursing license]; *Pating* v. *Board of Medical Quality Assurance* (1982) 130 Cal.App.3d 608 [182 Cal.Rptr. 20] [refusing to apply vicarious exclusionary rule in a disciplinary proceeding before the Board of Medical Quality Assurance, finding deterrent effect outweighed by state's interest in protecting the public from potentially life-threatening conduct on the part of physicians]; but see *Elder* v. *Bd. of Medical Examiners* (1966) 241 Cal.App.2d 246 [50 Cal.Rptr. 304] [assuming, without deciding, the rule would apply to administrative hearing that contemplates deprivation of the right to practice medicine].)

the act have been exhausted. Each level of treatment provided decreases the likelihood a conservatorship proceeding will be necessary. In such circumstances, the mental health worker is unlikely to shape his or her conduct in anticipation of the exclusion of evidence at such a proceeding. (Cf. *Lopez-Mendoza, supra,* 468 U.S. at p. 1044 [82 L.Ed.2d at p. 789] [noting that few arrests of undocumented aliens lead to formal deportation proceedings].)[10]

Moreover, the longer the detainee remains in treatment under the interim involuntary commitment provisions of the act, the less need has the department to rely on evidence extrinsic to the detainee's commitment to demonstrate grave disability under the act; the most relevant evidence of that disability will be derived primarily from the patient. The exclusion of earlier seized evidence would therefore have little effect on the outcome of the proceeding, and the deterrent effect of the rule would be proportionately weaker.

Finally, we have been asked to consider only whether the exclusionary rule should be applied in conservatorship proceedings; we have not been asked, and hence have no occasion to consider, whether we would apply the rule in the act's earlier and interim proceedings, i.e., the 14-day and 30-day certifications for intensive treatment. (§§ 5250, 5270.15.) We note, however, the Legislature has expressly provided that in both types of certification hearings, "[a]ll evidence which is relevant to establishing that the person certified is or is not as a result of a mental disorder . . . gravely disabled . . . shall be admitted at the hearing and considered by the hearing officer." (§§ 5256.4, subd. (d), 5270.15.) We have interpreted a similarly phrased constitutional provision relating to criminal proceedings as evidencing an intent to eliminate the exclusionary rule. (*In re Lance W., supra,* 37 Cal.3d 873, 886-890.) An exclusionary rule precluding the use of evidence in a *conservatorship proceeding* would have little or no deterrent effect on a mental health worker whose first concern most likely is securing for a gravely disabled person immediate or interim treatment under the *14-day* or *30-day certifications*, in which no exclusionary rule applies.

Removed from the realm of the theoretical, the deterrent effect of applying the rule in conservatorship cases is marginal at best. Against this marginal deterrent effect, we balance the social cost of applying the exclusionary rule to conservatorship proceedings. As previously noted, among the

---

[10]Amicus curiae Protection and Advocacy, Inc., states in its brief in support of Susan T. that 97 percent of *temporary* conservatorship hearings (§ 5352.1) in Los Angeles County are contested. A statistic reflecting the percentage of temporary conservatorship petitions that are contested, however, sheds little light on the percentage of detentions under section 5150 that ultimately result in the filing of either a temporary or a year-long conservatorship petition.

primary purposes of conservatorship proceedings are the prompt evaluation and treatment of persons who are gravely disabled, the provision for such persons of individualized treatment, supervision and placement services, and the guarantee and protection of public safety. (§§ 5001, subds. (b), (c), 5352.6.) These goals are frustrated if the best and most complete evidence concerning the detainee's mental condition is withheld from the trier of fact. As recognized in the dissenting opinion below, "[t]he exclusion of relevant evidence, even if gathered in violation of the proposed conservatee's privacy rights, could seriously inhibit the ability of the trier of fact to come to any rational conclusion about the conservatee's actual mental condition, with potentially severe consequences." Application of the exclusionary rule to conservatorship proceedings, unlike its application to criminal cases, would require the courts, to the potential detriment of both the public and the disabled detainee alike, to ignore the existence not of a single act, but of a *continuing state of grave disability* that our Legislature has determined should not be ignored. (Cf. *Lopez-Mendoza, supra,* 468 U.S. at p. 1047 [82 L.Ed.2d at p. 791] [noting effect of rule in deportation proceedings would require courts to ignore continuing presence of undocumented aliens].)

We cannot countenance this social cost for a deterrent effect that exists only in theory. Moreover, because the official conduct associated with the search was not so egregious as to offend the " 'traditions and [collective] conscience of our people' " (*Griswold* v. *Connecticut* (1965) 381 U.S. 479, 493 [14 L.Ed.2d 510, 520, 85 S.Ct. 1678] (conc. opn. of Goldberg, J.), quoting *Snyder* v. *Massachusetts* (1934) 291 U.S. 97, 105 [78 L.Ed. 674, 677-678, 54 S.Ct. 330, 90 A.L.R. 575]) or to "shock the conscience" (*Rochin* v. *California* (1952) 342 U.S. 165, 172 [96 L.Ed. 183, 190, 72 S.Ct. 205, 25 A.L.R.2d 1396]), admission of the disputed evidence in this case does not implicate due process concerns. (Cf. *In re Martinez, supra,* 1 Cal.3d at pp. 650-651.) Under these circumstances we decline to extend the exclusionary rule to conservatorship proceedings under the act.

## IV. DISPOSITION

Although the Court of Appeal concluded the exclusionary rule applied to conservatorship proceedings under the act, it found the introduction of the illegally seized evidence had no adverse impact on the jury's verdict and affirmed the judgment of the trial court finding Susan T. to be gravely disabled within the meaning of the act. We conclude the evidence was properly admitted and, on that basis, affirm the judgment of the Court of Appeal.

Lucas, C. J., Kennard, J., Arabian, J., Baxter, J., and George, J., concurred.

**MOSK, J.,** Concurring and Dissenting.—Like the majority, I would have no difficulty concluding, under the facts presented, that the entry of an employee of the Lake County Department of Mental Health into Susan T.'s home to "take some pictures as evidence" constituted a search under the Fourth Amendment. I also concur in the judgment, because, like the Court of Appeal, I believe the admission of the photographic evidence was harmless error. Unlike the majority, however, I conclude that the exclusionary rule should apply in conservatorship proceedings under the Lanterman-Petris-Short Act (LPS Act). (Welf. & Inst. Code, § 5000 et seq.)[1]

"[T]he 'basic purpose of [the Fourth] Amendment . . . is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials.' " (*Michigan* v. *Tyler* (1978) 436 U.S. 499, 504 [56 L.Ed.2d 486, 495, 98 S.Ct. 1942], quoting *Camara* v. *Municipal Court* (1967) 387 U.S. 523, 528 [18 L.Ed.2d 930, 935, 87 S.Ct. 1727].) The Supreme Court has emphasized the " 'overriding respect for the sanctity of the home that has been embedded in our traditions since the origin of the Republic.' " (*Oliver* v. *United States* (1984) 466 U.S. 170, 178 [80 L.Ed.2d 214, 224, 104 S.Ct. 1735], quoting *Payton* v. *New York* (1980) 445 U.S. 573, 601 [63 L.Ed.2d 639, 659-660, 100 S.Ct. 1371].) Susan T. did not lose the right to privacy and security when she was taken into custody by the Lake County Sheriff under section 5150. Indeed, the LPS Act expressly provides that "[p]ersons with mental illness have the same legal rights and responsibilities guaranteed all other persons by the Federal Constitution and laws and the Constitution and laws of the State of California"—including the right to privacy. (§ 5325.1, subd. (b); see also *Conservatorship of Roulet* (1979) 23 Cal.3d 219, 224 [152 Cal.Rptr. 425, 590 P.2d 1].)

The exclusionary rule has as its purpose deterrence of unlawful governmental intrusion into the right of personal privacy. (See *United States* v. *Calandra* (1974) 414 U.S. 338, 347 [38 L.Ed.2d 561, 571, 94 S.Ct. 613]; *United States* v. *Janis* (1976) 428 U.S. 433, 458, fn. 35 [49 L.Ed.2d 1046, 1063, 96 S.Ct. 3021].) As the Supreme Court stressed in first articulating the rule, if evidence seized in violation of the Fourth Amendment can be used in evidence against a citizen accused of an offense "the protection of the Fourth Amendment declaring his right to be secure against such searches and seizures is of no value, and, so far as those thus placed are concerned, might as well be stricken from the Constitution." (*Weeks* v. *United States* (1914) 232 U.S. 383, 393 [58 L.Ed. 652, 656, 34 S.Ct. 341].)

Although it is most commonly applied in the context of criminal proceedings, our courts have applied the exclusionary rule in a variety of civil and

---

[1]All statutory references are to the Welfare and Institutions Code.

administrative proceedings. (See, e.g., *People* v. *One 1960 Cadillac Coupe* (1964) 62 Cal.2d 92, 96-97 [41 Cal.Rptr. 290, 396 P.2d 706] [civil forfeiture]; *Goldin* v. *Public Utilities Commission* (1979) 23 Cal.3d 638, 669 [153 Cal.Rptr. 802, 592 P.2d 289] [Public Utilities Commission hearing]; *Elder* v. *Bd. of Medical Examiners* (1966) 241 Cal.App.2d 246, 260 [50 Cal.Rptr. 304] [administrative proceeding to revoke medical license]; *People* v. *Moore* (1968) 69 Cal.2d 674, 682 [72 Cal.Rptr. 800, 446 P.2d 800], overruled on other grounds, *People* v. *Thomas* (1977) 19 Cal.3d 630, 637 [139 Cal.Rptr. 594, 566 P.2d 228] [civil commitment proceedings for narcotic addicts]; see also 1 LaFave, Search & Seizure (2d ed. 1987) § 1.7(e), pp. 158-159 (LaFave) [citing cases applying the exclusionary rule in Federal Trade Commission hearings, Securities and Exchange Commission proceedings, Occupational Safety and Health Administration proceedings, proceedings before the Public Utilities Commission, National Labor Relations Board hearings, and other civil and administrative proceedings].)

In considering whether to apply the exclusionary rule in civil cases, courts apply a balancing test. (See *People* v. *Moore*, *supra*, 69 Cal.2d at p. 681; *Emslie* v. *State Bar* (1974) 11 Cal.3d 210, 227-228 [113 Cal.Rptr. 175, 520 P.2d 991]; *INS* v. *Lopez-Mendoza* (1984) 468 U.S. 1032, 1041 [82 L.Ed.2d 778, 787, 104 S.Ct. 3479].) Three considerations are of particular concern: the magnitude of the consequences for the individual involved, the extent to which exclusion would deter illegal searches and seizures, and the potential social cost of applying the rule. I believe the balance of these factors weighs unequivocally in favor of applying the exclusionary rule to LPS conservatorship proceedings.

A.  *Magnitude of Consequences for Potential Conservatees*

Although not a criminal proceeding, conservatorship proceedings under the LPS Act may result in "a massive curtailment of liberty" (*Humphrey* v. *Cady* (1972) 405 U.S. 504, 509 [31 L.Ed.2d 394, 402, 92 S.Ct. 1048]) as severe as that faced by a criminal defendant.[2] As Justice Brennan emphasized, "[p]ersons incarcerated in mental hospitals are not only deprived of their physical liberty, they are also deprived of friends, family, and community. Institutionalized mental patients must live in unnatural surroundings under the continuous and detailed control of strangers. They are subject to intrusive treatment which, especially if unwarranted, may violate their right

---

[2]The court order establishing a conservatorship may grant the conservator the authority to place the conservatee in a mental facility (§ 5358, subd. (a)) and to require the conservatee to undergo treatment (§ 5358, subd. (b)). An LPS conservatorship lasts for one year but may be reestablished for succeeding one-year periods. (§ 5361.)

to bodily integrity . . . . Furthermore . . . persons confined in mental institutions are stigmatized as sick and abnormal during confinement and, in some cases, even after release." (*Parham* v. *J.R.* (1979) 442 U.S. 584, 626-627 [61 L.Ed.2d 101, 133-134, 99 S.Ct. 2493] (conc. & dis. opn. of Brennan, J.), fn. omitted.)

Because involuntary confinement for mental illness, whether civil or criminal, involves a loss of liberty and substantial stigma, we have extended many of the same protections to potential conservatees as to criminal defendants. Thus, we have required that the facts triggering confinement be proved to a unanimous jury beyond a reasonable doubt. (*Conservatorship of Roulet, supra*, 23 Cal.3d 219; *Conservatorship of Hofferber* (1980) 28 Cal.3d 161, 178 [167 Cal.Rptr. 854, 616 P.2d 836].) Similarly, a proposed conservatee has the right to confront witnesses and to introduce evidence, and the right to appointed counsel and to free transcripts if indigent. (*Conservatorship of Baber* (1984) 153 Cal.App.3d 542, 550 [200 Cal.Rptr. 262]; *Waltz* v. *Zumwalt* (1985) 167 Cal.App.3d 835, 839 [213 Cal.Rptr. 529].) *Wende* review (*People* v. *Wende* (1979) 25 Cal.3d 436 [158 Cal.Rptr. 839, 600 P.2d 1071]) is also required if appointed appellate counsel finds no arguable issues or describes the appeal of an LPS Act conservatee as frivolous. (*Conservatorship of Besoyan* (1986) 181 Cal.App.3d 34, 38 [226 Cal.Rptr. 196].) The rationale for these decisions derives, in part, from our recognition that "the interests involved in civil commitment proceedings are no less fundamental than those in criminal proceedings and that liberty is no less precious because forfeited in a civil proceeding than when taken as a consequence of a criminal conviction." (*In re Gary W.* (1971) 5 Cal.3d 296, 307 [96 Cal.Rptr. 1, 486 P.2d 1201].)

The LPS Act and decisional law thus contemplate an adversarial proceeding in which the potential conservatee who opposes conservatorship is entitled to the assistance of counsel and many of the procedural rights of a criminal defendant. The majority's conclusion that there is no similarity between the aims and objectives of the act and those of criminal law is inconsistent with our repeated recognition that involuntary commitment proceedings involve similar considerations to criminal process because, like criminal defendants, potential conservatees are threatened with loss of liberty and social stigma.

Moreover, the fact that conservatorship proceedings are designed to protect rather than punish the conservatee does not detract from the serious curtailment of liberty that results from a finding of "grave disability" under the LPS Act. " ' "Regardless of the purposes for which the incarceration is

imposed, the fact remains that it is incarceration. The rehabilitative goals of the system are admirable, but they do not change the drastic nature of the action that has been taken." ' " (*Conservatorship of Roulet, supra*, 23 Cal.3d at p. 225, quoting *Breed* v. *Jones* (1975) 421 U.S. 519, 530, fn. 12 [44 L.Ed.2d 346, 536, 95 S.Ct. 1779].) In addition to the possibility of indefinite placement in a locked psychiatric facility—possibly the same facility used to house criminal defendants—a conservatee faces the loss of important legal rights and privileges, including the rights to enter contracts, to vote, to refuse or consent to medical treatment, including routine medical treatment for conditions unrelated to the conservatee's grave disability, and the privilege of possessing a driver's license. (§ 5357.)

In the analogous case of *People* v. *Moore*, we expressly rejected the argument that violations of the Fourth and Fourteenth Amendments should be condoned because involuntary commitment (in that case for narcotic addicts) was beneficent rather than punitive. (*People* v. *Moore, supra*, 69 Cal.2d at p. 682.) We concluded that to hold unconstitutionally obtained evidence admissible in commitment proceedings would furnish an incentive to conduct unreasonable searches and seizures. Accordingly, we held that the exclusionary rule applied to narcotics addict proceedings. (*Ibid.*)

I can see no principled basis for distinguishing *Moore* from the present case. I am unpersuaded by the majority's attempt to distinguish *Moore* on the ground that imposition of a conservatorship does not depend on a charged or uncharged criminal act. *Moore* did not turn on the possibility that a narcotics addict was engaged in criminal activity. Instead, we applied the exclusionary rule on the basis that involuntary *civil* commitment under section 3000 et seq. "has some of the features pertinent to a criminal case in view of the facts that the state is the defendant's opponent, that the proceeding is commenced on petition of the district attorney . . . , that the defendant is entitled to be present at the hearing and to be represented by counsel at all stages of the proceeding . . . , that if he is financially unable to employ counsel he is entitled to appointed counsel . . . and that his liberty is at stake." (*People* v. *Moore, supra*, 69 Cal.2d at p. 681, citations omitted.)

Each of these features—along with other features analogous to criminal proceedings discussed, *ante*—is present in LPS conservatorship hearings. Thus, under the LPS Act a person may be taken into custody by a police officer or designated health officer on probable cause (§ 5150 [cf. § 3100.6]); the establishment of a conservatorship is initiated by the state, with the conservatorship proceedings being brought by the district attorney (§ 5114 [cf. § 3100]); potential conservatees are entitled to appointed counsel (§ 5364 [cf. § 3104]) and free appeal transcript (*Waltz* v.

*Zumwalt, supra,* 167 Cal.App.3d 835 [cf. *People* v. *Moore, supra,* 69 Cal.2d at p. 681]); and the liberty of potential conservatees is clearly at stake (§ 5358 [cf. § 3106]).

An additional consideration in LPS proceedings is the high risk of error. We have repeatedly stressed the uncertainties that surround psychiatric diagnoses and the concomitant risk that a person will be wrongly subjected to the loss of liberty and reputation in commitment proceedings. (*Conservatorship of Roulet, supra,* 23 Cal.3d 219, 230; *People* v. *Burnick* (1975) 14 Cal.3d 306, 327 [121 Cal.Rptr. 488, 535 P.2d 352].) Federal courts, too, have expressed concern about the high risk of error in involuntary commitment proceedings. "The risk of error in all mental health decisions is substantial. Even when a standard requires a specific finding of dangerousness, there is great risk of error. . . . As Chief Justice Burger wrote in his concurring opinion in *O'Connor* v. *Donaldson* . . . '[t]here can be little responsible debate regarding "the uncertainty of diagnosis in this field and the tentativeness of professional judgment." ' " (*Doe* v. *Gallinot* (C.D.Cal. 1979) 486 F.Supp. 983, 992, affd. 657 F.2d 1017 (9th Cir. 1981), quoting *O'Connor* v. *Donaldson* (1975) 422 U.S. 563, 584 [45 L.Ed.2d 396, 412, 95 S.Ct. 2486] (conc. opn. of Burger, C. J.); see also Ennis & Litwack, *Psychiatry and the Presumption of Expertise: Flipping Coins in the Courtroom* (1974) 62 Cal.L.Rev. 693; Morse, *Crazy Behavior, Morals and Science: An Analysis of Mental Health Law* (1978) 51 So.Cal.L.Rev. 527; Morse, *A Preference for Liberty: The Case Against Involuntary Commitment of the Mentally Disordered* (1982) 70 Cal.L.Rev. 54.)

In *People* v. *Burnick,* I quoted Professor Wigmore's observation that " '[t]he mental condition of one whose mind is so deranged as to require imprisonment for his own and others' good is indeed pitiable. But the mental attitude of one who is falsely found insane and relegated to life imprisonment is beyond conception. No greater cruelty can be committed in the name of the law.' " (14 Cal.3d at pp. 309-310 (opn. by Mosk, J.), quoting 5 Wigmore on Evidence (Chadbourn rev. 1974) § 1400, p. 201).) That observation remains apt despite the efforts by the Legislature to include safeguards for individuals subjected to involuntary commitment proceedings under the LPS Act. (See also Rosenhan, *On Being Sane in Insane Places* (1973) 13 Santa Clara L.Rev. 379, 382-384; Morris, *Conservatorship for the "Gravely Disabled": California's Nondeclaration of Nonindependence* (1978) 15 San Diego L.Rev. 201.)

As the Court of Appeal held below, the subjective nature of the criteria pertinent to the decision to begin a commitment procedure, as well as the

uncertain relationship between mental disorder and legal incompetence, increase the possibility that the administrative decision to conduct a search may be misguided or result from "caprice or . . . personal or political spite" (*Eaton* v. *Price* (1960) 364 U.S. 263, 271 [4 L.Ed.2d 1708, 1713, 80 S.Ct. 1463]) or be a subterfuge for a criminal investigation. (See *Abel* v. *United States* (1960) 362 U.S. 217, 239-240 [4 L.Ed.2d 668, 686-687, 80 S.Ct. 683].) Thus, application of the exclusionary rule in LPS Act conservatorship proceedings would deter governmental intrusions on personal privacy that may be just as pernicious as the activities the exclusionary rule is designed to deter in criminal cases.

### B.  *Deterrence*

The exclusionary rule is based on the principle that the state should not profit from its own wrong in using evidence obtained by unconstitutional methods. (*Emslie* v. *State Bar*, *supra*, 11 Cal.3d 210, 226-227.) Accordingly, a key consideration in determining whether the exclusionary rule should apply is the extent to which exclusion would deter unconstitutional searches and seizures. (*Ibid.*) The majority conclude that the deterrent effect of applying the exclusionary rule in LPS Act conservatorship cases is merely theoretical. I disagree.

The deterrence argument for exclusion is most compelling when "the administrative agency in question has an investigative function and investigative personnel of that agency participated in the illegal activity for the purpose of providing information to support administrative proceedings against the suspect." (1 LaFave, *supra*, at p. 161, fn. omitted.) Here, the same mental health officials who ordered and conducted the search for evidence in Susan T.'s home sought to use the fruits of the search (the photographs) at the LPS conservatorship proceedings. Indeed, under the LPS Act, mental health officials are statutorily required to act as evidence-gatherers and witnesses against the prospective conservatee. (§ 5150.) The deterrent effect of applying the exclusionary rule in this and other LPS Act conservatorship proceedings would thus be direct. If mental health officials know that evidence obtained in illegal searches will be excluded in conservatorship proceedings, they will have a strong disincentive to conducting searches without obtaining a warrant.

The majority concede that the deterrent effect of the rule is at its greatest when, as is true here, the government agency that effected the search is the same agency that seeks to introduce the fruits of its search at trial. They surmise, however, that precluding the use of evidence in a conservatorship

proceeding might have little or no deterrent effect on a mental health worker interested in securing interim treatment under the act under the 14-day or 30-day certifications (§§ 5250, 5270.15), as to which the exclusionary rule may not apply. From this the majority conclude that the deterrence value would be limited. I disagree.

Unlike *Lopez-Mendoza*, on which the majority rely, this is not a situation in which the rarity of challenges to proceedings weakens the deterrent effect of the rule. (*INS* v. *Lopez-Mendoza, supra,* 468 U.S. 1032.) Indeed, the rate of contested conservatorship hearings is apparently substantial. Certainly, even if, as the majority conjecture, some mental health workers may be interested in securing only interim treatment for a detainee, there is no reason to conclude that conservatorship proceedings are so unusual that mental health workers would as a general rule be heedless of the privacy rights of detainees regardless of the exclusionary rule.

The majority also reason that the deterrent value of applying the exclusionary rule is weakened in conservatorship trials because by that stage of the involuntary commitment process the "most relevant" evidence of disability will be derived from the detainee herself. Again, I disagree. A detainee's living conditions prior to being taken into custody are clearly pertinent to a determination that he or she is "gravely disabled," i.e., "unable to provide for his or her basic personal needs for food, clothing, or shelter." (§ 5008, subd. (h)(1)(A).) In this case, the photographic evidence was cumulative, but it was undoubtedly "relevant" and the motion to suppress was vigorously opposed by respondent Lake County Mental Health Department. In my view, there is substantial reason to conclude that the deterrent effect of applying the exclusionary rule in cases such as this would be real, and not merely theoretical.

## C.  *Social Costs*

The social costs of applying the exclusionary rule to LPS conservatorship proceedings are minimal. Once aware of the warrant requirement, department employees will have a significant incentive to respect the privacy rights of detainees.[3] There is no reason to think that important evidence will be lost or destroyed if mental health authorities are required to obtain

---

[3]Indeed, the San Francisco Public Defender observed that searches like the one at issue here have been infrequent "because it is clear that you need a warrant to get into a house. To even seize a dog you need an administrative warrant." (Ziegler, *Exclusionary Rule Applies in Commitment,* San Francisco Daily Journal (Aug. 4, 1993) at p. 1.)

a warrant before entering the home of a person thought to be gravely disabled.[4]

In the unusual event that a search is conducted in violation of the constitutional requirement, it is unlikely that the trier of fact would be seriously hampered in reaching a rational conclusion about the potential conservatee's mental condition. Contrary to the majority's conclusion, a court applying the exclusionary rule would not be required to ignore the existence of a *continuing state of grave disability.* The trier of fact will have the opportunity to hear evidence presented by the mental health professionals who administered the mandatory psychiatric evaluations and treatment of the proposed conservatee (§ 5152 [evaluation during 72-hour hold under § 5150]; § 5251 et seq. [certification for intensive treatment]; § 5260 [confinement for additional treatment]). The court also receives, and may enter into evidence, a comprehensive written report mandated by the act, which must contain "all relevant aspects of the person's medical, psychological, financial, family, vocational and social condition, and information obtained from the person's family members, close friends, social worker or principal therapist." (§ 5354.) Moreover, as this case demonstrates, evidence may also be presented by other percipient witnesses, including family and neighbors. The proposed conservatee may also be required to testify at the conservatorship trial. (See *Conservatorship of Baber, supra,* 153 Cal.App.3d at p. 550 [proposed conservatee cannot refuse to testify at conservatorship proceeding].)

Thus, the LPS Act itself reduces the risk that a gravely disabled person will be released without imposition of a conservatorship. Indeed, as the majority observe, the longer a detainee remains in treatment under the interim involuntary commitment provisions of the act, the less need the department will have to rely on extrinsic evidence to demonstrate grave disability. Precisely because LPS Act conservatorship proceedings involve a continuing state of grave disability and not a single act, the social costs of requiring mental health workers to comply with the constitutional limits on the invasion of personal privacy are minimized. Moreover, unlike criminal proceedings in which the risk is that a guilty person will be set free, in the LPS Act context a person released can be detained again if she exhibits new behavior demonstrating grave disability as a result of a mental disorder. (See *Conservatorship of Baber, supra,* 153 Cal.App.3d at pp. 549-550 [double jeopardy doctrine inapplicable in LPS conservatorship proceedings].)

---

[4]To avoid harm in existing cases, application of the exclusionary rule could be applied only prospectively. (See *Conservatorship of Roulet, supra,* 23 Cal.3d at p. 235, fn. 18 [heightened burden of proof applied prospectively].)

A person detained under the LPS Act, like all other citizens, has a reasonable expectation of privacy in the sanctity of her home. Although the goals of the LPS Act are beneficent, the loss of liberty and reputation to a conservatee is grave. Weighing the costs and benefits, I can see no basis for ignoring the fundamental guarantees against unreasonable searches and seizures in conducting investigations of potential conservatees. Accordingly, I would apply the exclusionary rule to LPS Act conservatorship proceedings.