2000 OK 30

Fern Alice TOWNE, Petitioner–Appellant,

v.

Carol Ann HUBBARD, Honorable Judge of the District Court, Oklahoma County, 7th Judicial District, Respondent,

v.

Cindy Munkres and Gerald E. Kelley, Appellees.

In the Matter of the Guardianship of Fern Alice Towne.

No. 92412.

Supreme Court of Oklahoma.

April 18, 2000.

Harley E. Venters, Venters & Venters, Oklahoma City, Oklahoma, and Val R. Miller, Oklahoma City, Oklahoma, for Appellant, Fern Alice Towne.

Joe S. Rolston, III, Rolston & Hamill, Oklahoma City, Oklahoma, for Appellee, Cindy Munkres.

Gerald E. Kelley, Kelley & Kelley, P.C., Oklahoma City, Oklahoma, Court–Appointed Counsel for Fern Alice Towne.

OPALA, J.

¶1 The dispositive question on this appeal is whether the trial court's inquiry, which resulted in the removal of Towne's retained counsel and his replacement by a court-appointed legal practitioner, complied with the requirements of due process of law. We answer in the negative.

## I

### ANATOMY OF LITIGATION

¶2 Cindy Munkres ("Munkres") filed a petition in the District Court, Oklahoma County, for the appointment of a guardian for her aunt, Fern Alice Towne ("Towne"), an 87 year old, childless widow. Munkres alleged that her aunt suffered from dementia, impairing her ability to receive and evaluate information, to provide adequately for her own physical health and safety, and to manage prudently her financial resources. It was also alleged that Towne's dementia made her susceptible to the influence of non-family members.

¶3 Towne admitted in her answer that she required assistance in managing her financial resources, but insisted that she had already arranged for whatever aid was necessary to enable her to remain living independently and managing her own personal and business affairs. She denied she was incapable of making informed, reasonable decisions regarding her own welfare and denied that she was in need of a guardian.

¶4 At a hearing on the guardianship petition, set for 29 December 1998, Towne ap-

peared in person and through her retained attorney, Harley E. Venters ("Venters"). Despite notice stating that the guardianship petition would be addressed, the hearing was confined to an inquiry—pursuant to the terms of 30 O.S.1991 § 3–107(G) ("§ 3–107 (G)")[2]—into whether Venters was "independent" or whether he had any conflict of interest requiring his removal as Towne's attorney. The inquiry was conducted informally and was limited to questions from the bench directed to Towne and Venters, *neither of whom was sworn as a witness*. It is apparent from the transcript that the court questioned Towne twice, first without a court reporter present to transcribe the proceeding and a second time in the presence of a court reporter.

¶ 5 Under questioning by the court on the record, Towne was unable to state with specificity the reason for her appearance in court, other than to say that she was involved in a dispute with her relatives. She acknowledged that she had earlier, off the record, told the court that she was not aware a guardianship petition had been filed. She appeared confused about who had brought the action and in which county the petition had been filed. She also seemed confused by the discussion of her right to a court-appointed attorney, apparently concerned about the financial obligation that would involve.

When asked whether she was paying an attorney to represent her that day, she answered in the affirmative, but pronounced Venters' name incorrectly. She displayed little or no recollection of the various legal arrangements which she claimed in her answer to the guardianship petition to have entered into for the purpose of obtaining assistance in handling her financial affairs.[3]

¶ 6 On the other hand, Towne knew generally that a disagreement with her niece and other relatives had brought her into court, appeared to understand the nature of a guardianship and insisted that she did not need a guardian, recalled that she had asked Harold Sinclair ("Sinclair")[4] to help her with her financial affairs,[5] and was aware that she had an attorney present to represent her. As to how she had come to hire Venters, the following exchange took place:

THE COURT: And how did you get Mr. Venters?

MS. TOWNE: Well, I got him when this first arose.

THE COURT: And who got him for you?

MS. TOWNE: Mr. Sinclair.

THE COURT: Mr. Sinclair got him for you: . . . .

¶ 7 After completing her questioning of Towne, the court turned her attention to

---

2. *See* supra note 1 for the text of § 3–107(G).

3. Towne's estate planning documents, which were the subject of the court's questioning at the hearing, were not admitted into evidence at that time and were not submitted to this court as part of the original record on appeal. They were subsequently offered as part of a supplemental record on appeal in connection with Towne's motion to stay prior orders of the trial court pending this appeal. In Towne's answer to the guardianship petition, she described the general content of these documents, stating that practically all of her assets are held in a trust known as the Fern A. Stewart Revocable Trust dated June 1, 1976, that she and Harold Sinclair are co-trustees of that trust, and that she has executed a durable power of attorney in favor of Harold Sinclair. Faced with the court's questions at the hearing, Towne was unable to recall this information. She thought she had a trust and remembered that her brother had been the trustee until his death, which, she believed, had occurred just three weeks earlier. [There is no evidence *in the record* of the date of her brother's

death, but the parties' briefs state that he died approximately a year before the hearing.] She thought that she had not yet named a new trustee to replace her brother. She hoped or guessed that she was a trustee and she was unsure whether Mr. Sinclair was a trustee as well. Asked what a durable power of attorney was, she could not say, but after the court provided a partial explanation of the term, she stated that she did not have one.

4. Harold Sinclair is identified in Towne's answer as a long-time personal friend of Towne and her deceased husband and as a person of substantial means and business experience.

5. She responded affirmatively to the court's inquiry as to whether she had given Harold Sinclair the power to handle her financial affairs, but thought that she had only verbally asked him to do so. When pressed to describe what she had asked Sinclair to do, she responded that he was to help her if she received some advertising and did not know what to do with it "and just anything like that that came up."

Venters, briefly and informally questioning him regarding his initial contacts with Towne. This exchange revealed that Sinclair had contacted Venters on Towne's behalf on 28 November 1998 and that Venters had gone immediately to meet with Towne and Sinclair. Venters told the court that he ascertained at that meeting that Towne needed help, that she was being pressured about a house, and that she wanted a durable power of attorney given to Sinclair. Venters then stated that he returned to his office and prepared a durable power of attorney in accordance with Towne's wishes, which Towne executed the next day, 29 November 1998. *The trial judge rejected Venters' attempts to expand upon these bare facts and ignored Venters' request to present witnesses to testify regarding his independence.*

¶ 8 Stating that she was "not persuaded that ... [Towne] has the capacity to contract," and expressing her concern "that [Towne's] rights and her rights alone be independently represented," *the trial court removed Venters as Towne's attorney, suggested Venters might want to represent Sinclair as the holder of the power under the durable power of attorney, and announced that she would appoint independent counsel for Towne.*

¶ 9 The trial judge and the attorneys then entered into further discussion in which the court was informed that Venters had prepared estate planning documents for Towne in addition to the durable power of attorney. Venters informed the court that Towne had appointed herself and Sinclair as co-trustees of a living trust, and Munkres' attorney informed the court that Towne had appointed Sinclair, Venters, and a nephew by marriage, Norman Wright, to a trust committee, which was to provide advice to the co-trustees. Munkres' attorney also advised the court

that Towne had executed a new will, which named Sinclair as her personal representative.

¶ 10 In her order of 5 January 1999, the trial judge found that it was Sinclair and not Towne who had selected Venters and that Venters had previously represented Sinclair.[6] She also found that the day after Sinclair first introduced Venters to Towne, Venters began to prepare a series of legal documents giving Sinclair authority to handle Towne's financial resources and estate. *From these facts, the trial court concluded that Venters might owe his loyalty to Sinclair rather than to Towne.* The trial court found further evidence of Venters' lack of independence in the fact that the estate planning documents Venters had prepared for Towne were executed by her barely a month before the guardianship petition was filed. *The court found that Venters' professional self-interest in upholding the integrity of those documents might compel him to defend Towne's mental competence and oppose the guardianship, in conflict with his professional duty to engage in an objective evaluation of his client's need for a guardian.* For these reasons, the trial court found that Venters was not independent and that other counsel should be appointed for Towne. *The following day, the trial court selected Gerald E. Kelley as Towne's court-appointed counsel.*

¶ 11 Venters, on behalf of Towne, filed with this court an application to assume original jurisdiction and a petition for a writ of prohibition to bar the trial court from removing him as Towne's attorney and replacing him with a court-appointed legal practitioner. This court recast the quest for a prerogative writ into a timely appeal from an interlocutory order in guardianship and *sua sponte* retained the cause for disposition.[7] We now hold that the proceeding which resulted in

---

6. No evidence appears in support of this finding in the transcript of the December 29 hearing nor anywhere else in the record on appeal. In a brief, Venters states only that he has known Sinclair for a number of years and had probated Sinclair's mother's estate.

7. In the order recasting the original proceeding into an appeal from an interlocutory order in guardianship, *we designated Towne as the appellant. Towne v. Hubbard,* 1999 OK 10, 977 P.2d

1084. She promptly filed a petition in error by and through Venters, her retained counsel. Meanwhile, Towne's court-appointed counsel, identifying Towne as an *appellee*, filed a response to the petition in error, opposing the position advocated by Venters on Towne's behalf. This cause hence stands in the paradoxical posture of having the same party labeled by different attorneys as both appellant and appellee.

Venters' removal did not comport with the requirements of due process and hence violated Towne's fundamental right to choose her own attorney. *We hence reverse the trial court's order and remand the cause for a determination of Venters' independence in an adversarial proceeding to be conducted in accordance with this pronouncement.*

## II

### THE RIGHT OF A PROSPECTIVE WARD IN A GUARDIANSHIP PROCEEDING TO BE REPRESENTED BY A LEGAL PRACTITIONER OF HIS (OR HER) OWN CHOOSING CANNOT BE ABRIDGED BY MEANS INCONSISTENT WITH DUE PROCESS OF LAW

¶ 12 A guardianship proceeding poses the risk to the prospective ward of a massive curtailment of liberty as well as of the infliction of adverse social consequences.[8] The ward must submit his person, estate, and business affairs to the control of the guardian.[9] The ward's freedom to choose his place of residence, to travel, and to carry on relationships with others is limited or terminated.[10] Numerous statutory disabilities are placed upon a ward, including the loss of the right to remain licensed to practice a profession,[11] to marry,[12] to own or possess firearms,[13] to operate a motor vehicle,[14] to serve as a juror,[15] and to remain registered to vote.[16]

¶ 13 The United States Supreme Court and this court have both held that the state's participation in any proceeding, the result of which may be the significant restriction of a person's liberty, requires that the person be afforded the protections of due process.[17] A constitutionally unassailable guardianship proceeding must therefore include proper written notice, a hearing at which the prospective ward may appear and present evidence, the opportunity to confront and cross-examine adverse witnesses, a neutral decision-maker, *representation by counsel,*[18] findings meeting a clear and convincing

8.  *In re Guardianship of Deere,* 1985 OK 86, ¶ 6, 708 P.2d 1123, 1125.

9.  *Id.*

10. *Id.* at ¶ 6, at 1125–1126.

11. *See* e.g., 5 O.S.1991 Ch.1, App 1–A, Rule 10 (Suspension for Personal Incapacity to Practice Law); 59 O.S.1991 § 637(A)(14) (osteopathic physicians); 59 O.S.1991 § 887.13(8) (physical therapists).

12. *See,* 43 O.S.1991 § 1.

13. *See,* 21 O.S. Supp.1999 § 1289.10 (making it a crime to sell or transfer a firearm to one who has been adjudicated incompetent).

14. *See,* 47 O.S. Supp.1999 § 6–119.

15. *See,* 38 O.S. Supp.1999 § 28.

16. *See,* 26 O.S.1991 § 4–101(2).

17. *Addington v. Texas,* 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979); *In re Guardianship of Deere,* 1985 OK 86, 708 P.2d 1123; *In re D.B.W.,* 1980 OK 125, 616 P.2d 1149; *In re Adams,* 1972 OK 85, 497 P.2d 1080.

18. The right to representation by counsel in judicial proceedings is grounded in both the federal and state constitutions. The right is expressly conferred upon defendants in criminal cases by the Sixth Amendment to the United States Constitution and by Art. 2, § 20 of the Oklahoma Constitution. The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall have the right ... to have the Assistance of Counsel for his defense." *See, Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), in which the Supreme Court stated that the Sixth Amendment "embodies a realistic recognition of the obvious truth that the average defendant does not have the professional legal skill to protect himself when brought before a tribunal with power to take his life or liberty, ...."). *Id.* at 462, 58 S.Ct. at 1022. The provisions of Article 2, § 20 of the Oklahoma Constitution differ slightly from those of the Sixth Amendment. Article 2, § 20 provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be heard by himself and counsel." Although no explicit right to counsel is set forth in the United States Constitution outside the criminal defense context, the United States Supreme Court has held that the assistance of a legal practitioner is fundamental to due process in certain types of civil litigation, aspects of which are analogous to criminal proceedings. U.S. Constitution, Fifth and Fourteenth Amendments; Okla. Const. Art. 2, § 7. *See, e.g., Kent v. United States,* 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966) (due process entitles child to assistance of counsel in juvenile court waiver proceeding, calling the right to representation by counsel "the essence of justice"); *In re Gault,*

evidence standard,[19] and a record sufficient to permit meaningful appellate review.[20]

¶ 14 The right to the assistance of legal counsel includes the right to be represented by a legal practitioner of one's own choosing.[21] In *Powell v. Alabama*,[22] the United States Supreme Court stated, "It is hardly necessary to say that the right to counsel being conceded, a defendant should be afforded a fair opportunity to secure counsel of his own choice."[23] This right to select counsel without state interference is implied from the nature of the attorney-client rela-

tionship within the Anglo–American adversarial system of justice, wherein an attorney acts as the personal agent of the client and not of the state.[24] It is also grounded in the due process right of an individual to make decisions affecting litigation placing his or her liberty at risk.[25] Legal practitioners are not interchangeable commodities. Personal qualities and professional abilities differ from one attorney to another, making the choice of a legal practitioner critical both in terms of the quality of the attorney-client relationship and the type and skillfulness of the professional services to be rendered.[26]

387 U.S. 1, 36, 87 S.Ct. 1428, 1448,18 L.Ed.2d 527 (1967) (due process right to counsel by minor in determination of delinquency where the prospect of incarceration exists); *Specht v. Patterson*, 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967) (individual convicted under a Sex Offenders Act for an indeterminate term with no notice of a full hearing); *McNeil v. Director Patuxent Institution*, 407 U.S. 245, 92 S.Ct. 2083, 32 L.Ed.2d 719 (1972) (individual sent to a juvenile home for an indeterminate term on the basis of an ex parte order committing him for examination). *See also, Heryford v. Parker*, 396 F.2d 393, 396 (10th Cir.1968) (in habeas corpus proceeding brought on behalf of a mentally deficient person who was not afforded legal counsel at a hearing which resulted in his involuntary commitment to state institution, the court said, "Where, as in both proceedings for juveniles and mentally deficient persons, the state undertakes to act in parens patriae, it has the inescapable duty to vouchsafe due process, and this necessarily includes the duty to see that a subject of an involuntary commitment proceedings (sic) is afforded the opportunity to the guiding hand of legal counsel at every step of the proceeding, unless effectively waived by one authorized to act in his behalf."); *Lessard v. Schmidt*, 379 F.Supp. 1376 (E.D.Wis.1974) (state civil commitment statutes denied due process by failing to guarantee, *inter alia*, the right to be represented by adversary counsel), *vacated on other grounds*, *Schmidt v. Lessard*, 421 U.S. 957, 95 S.Ct. 1943, 44 L.Ed.2d 445 (1975), *prior judgment reinstated on remand*, *Lessard v. Schmidt*, 413 F.Supp. 1318 ( E.D.Wis.1976). These cases all involved quasi-criminal hearings, and the United States Supreme Court (or lower federal court) concluded that the deprivation of the fundamental right to liberty was so great that due process requirements had to be met. *See also, In re D.B.W.*, 1980 OK 125, 616 P.2d 1149, n. 5 ("The United States Supreme Court has made it clear that a proceeding does not have to be criminal in order for due process guarantees to apply."); *Tetro v. Tetro*, 86 Wash.2d 252, 544 P.2d 17,19 (1975)(right to appointed counsel in contempt proceeding where incarceration may occur re-

gardless of whether proceeding is labeled civil or criminal. "In proceeding civil in form, but criminal in nature—such as juvenile delinquency or mental commitment hearings—representation is clearly part of due process.").

19.  The burden of proof is set by the provisions of 30 O.S.1991, § 3–111.

20.  *Id*. Most of these rights have been codified at 30 O.S.1991, §§ 3–106.

21.  The Latin phrase *"delectus personae"* ("choice of the person") *is* usually used in connection with general partnerships and employment relationships. Black's Law dictionary, p. 512 (Revised Fourth Ed.1968). *See, e.g., Ferguson v. Nagle*, 159 Okla. 219, 15 P.2d 1 (1932) (*delectus personae* refers to the right of one partner to determine whether a new partner shall be admitted to a partnership); *Howard v. Harwood's Restaurant Co.*, 43 N.J.Super. 301, 128 A.2d 727 (1957) and *Cummings v. United Resort Hotels, Inc.*, 85 Nev. 23, 449 P.2d 245 (1969) (employer has the right of *delectus personae.*). *The phrase also applies to the attorney-client relationship where trust and confidence in a particular individual is central to the relationship.*

22.  287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932).

23.  287 U.S. 45, 53, 53 S.Ct. 55, 58, 77 L.Ed. 158 (1932). *See also, Harling v. United States*, 387 A.2d 1101, 1104 (D.C.App.1978).

24.  *Douglas v. United States*, 488 A.2d 121, 141 (D.C.App.1985). *See also*, In re Mandell, 69 F.2d 830, 831 (2nd Cir.1934) ("The relationship between attorney and client is highly confidential, demanding personal faith and confidence in order that they may work together harmoniously.").

25.  *Douglas, supra*, note 24 at 141.

26.  *United States v. Laura*, 607 F.2d 52, 55–56 (3rd Cir.1979) (right of criminal defendant to

¶ 15 Notwithstanding its constitutional status, the right to select one's own counsel is not absolute.[27] A litigant's choice of counsel may be set aside under limited circumstances, where honoring the litigant's choice would threaten the integrity of the judicial process. This most often arises where an attorney's compliance with ethical standards of professional responsibility are challenged. Although it is principally a lawyer's responsibility when undertaking a representation to settle questions regarding possible conflicts of interest, a court may also consider the question, when it is appropriately raised by the motion of one of the parties, by acting in the exercise of its power to regulate the conduct of those involved in a judicial proceeding before it,[28] or where, as here, a statute directs the court to consider the matter.[29]

¶ 16 The statute relied upon here to disqualify Venters removes—from the attorney and client in the guardianship context—their joint responsibility of resolving the ethical concern for independence embodied in Rule 1.7 of the Oklahoma Rules of Professional Conduct.[30] The cited rule states the general ethical principle that a lawyer's independence shall not be compromised by conflicting loyalties. Under the express terms of the rule, a lawyer may ordinarily undertake a representation despite the existence of a conflict of interest if the lawyer reasonably believes the conflict will not adversely affect the client, and the client, after consultation, consents.[31] In the context of a guardianship proceeding, Section 3–107(G) establishes an exception to this rule in light of the very real possibility that the prospective ward may not be competent to give informed consent to his (or her) representation. Instead of the attorney and client resolving the conflict issue, § 3–107(G) places the decision in the hands of the trial judge. Because this decision impinges upon the prospective ward's fundamental right to select his (or her) own attorney, we hold that a trial judge acting under the authority of § 3–107(G) must comply with the requirements of due process of law by *including adequate advance notice to the prospective ward that retained counsel will be subject to removal and by conducting a meaningful evidentiary hearing in the context of orderly adversarial procedure in the event the matter is pursued.*

¶ 17 The Oklahoma Guardianship and Conservatorship Act[32] sets forth specific requirements for service of notice of the commencement of a guardianship proceeding.[33] Among its provisions, *none requires notice of the trial court's statutory authority to conduct an inquiry into the independence of a prospective ward's retained counsel and to remove retained counsel in derogation of the prospective ward's fundamental right to counsel of choice.*[34] Not even the text of § 3–107(G) contains a directive for notice to the prospective ward that retained counsel may be removed. Without sufficient notice that retained counsel's independence is sub-

choose particular legal practitioner protected by Sixth Amendment to the United States Constitution which prohibits arbitrary interference with individual's choice).

**27.** *Id.* at 56.

**28.** *See, e.g., People v. Speedee Oil Change Systems, Inc.,* 20 Cal.4th 1135, 86 Cal.Rptr.2d 816, 980 P.2d 371 (1999).

**29.** *See* the provisions of 30 O. S., 1991 § 3–107(G), *supra,* note 1.

**30.** That rule, found at 5 O.S.1991, Ch. 1, App. 3–A. Rule 1.7, Oklahoma Rules of Professional Conduct, states in pertinent part:

"(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to an-

other client or to a third person, or by the lawyer's own interests, unless:
(1) the lawyer reasonably believes the representation will not be adversely affected; and
(2) the client consents after consultation...."

**31.** *Id.*

**32.** The Oklahoma Guardianship and Conservatorship Act is codified at 30 O.S.1991, § 1–101 et. seq.

**33.** *See* the provisions of 30 O.S.1991, § 3–110.

**34.** While the provisions of 30 O.S.1991, § 3–106 require that notice be given of all hearings conducted pursuant to Article III of the Oklahoma Guardianship and Conservatorship Act, they tie the requisite notice to the provisions of § 3–110, which do not include any reference to notice of

ject to the trial court's scrutiny, the prospective ward is deprived of a meaningful opportunity to prepare a response, a fundamental component of due process. We hold that to the extent the provisions of § 3–107(G) fail to require notice to the prospective ward of the court's authority to override his (or her) fundamental right to counsel of choice, they are constitutionally infirm. In the absence of the required notice, it is incumbent upon the trial court, *upon timely objection or motion of the prospective ward,* to cure the due process defect by continuing the inquiry for the presentation of evidence or for argument (or briefing) to take place at a later date.

¶ 18 Although Towne received no notice in this case that the question of her attorney's independence could be or would be raised at the hearing, *we decline to reverse the trial court's order on the basis of a defect in notice. This is so because Towne did not timely object to the lack of notice or request a continuance for further argument or for briefing.* By failing timely to object and by taking part in the proceeding, Towne waived her objection to lack of notice.[35]

¶ 19 *The trial court's order must nonetheless be reversed for another reason.* "A party's opportunity to present its case is an essential element of due process."[36] Due process requires an orderly proceeding in which the parties are given "an opportunity to be heard, and to defend, enforce and protect their rights."[37] In this case, the trial court's conduct of its inquiry into Venters' independence proceeded in a manner which deprived Towne of a meaningful opportunity to protect her fundamental right to choose her own attorney. *Despite Venters' request to present evidence and witnesses in support of his independence, the trial court would not permit him to do so. This alone constitutes a denial of a fundamental right.* As a result, no exhibits were admitted into evi-

dence and no sworn testimony was heard. Despite the informality of the proceeding, every attempt by Venters to throw some light on the genesis of his relationship with Towne came to be rejected. Towne was hence denied any meaningful opportunity to refute through her attorney the trial judge's impression that Towne was too confused and uncomprehending to be capable of choosing her own counsel. *Nor was Towne afforded a reasonable opportunity to respond in an adversarial context to the trial judge's adverse reaction to the circumstances of Sinclair's involvement in bringing Venters and Towne together.* Preventing counsel from presenting tendered evidence on a critically important matter "is tantamount to denial of counsel."[38] Although Towne interjected no formal objection to the trial court's refusal to hear testimony, we view Venters' offer to present witnesses and his attempts informally to defend his independence as sufficient for the purpose of preserving the due process issue for appeal. By this holding, we do not mean to say that the independent inquiry mandated by § 3–107(G) must observe all the due process formalities of a criminal trial, but rather that it must provide the essential components of due process and fair treatment.[39] *Just as a trial without a right to cross examine adverse witnesses denies one due process, so, too, a hearing in which one has no opportunity to present witnesses for refutation of the adverse position offends the litigant's fundamental right to due process of law.* An opportunity fully to develop the facts is essential. In short, a judicial examination under § 3–107(G) must minimally include the opportunity for a full adversarial evidentiary hearing and, if removal of the retained attorney is deemed warranted by the evidence, an order containing a specific factual finding of the disqualifying conflict of interest.[40]

the statutory inquiry into retained counsel's independence.

35. *Carlton v. Quint,* 77 Cal.App.4th 690, 91 Cal. Rptr.2d 844, 847–48 (2000); *P.B. and B.B. v. Dep't. of Children and Family Services,* 709 So.2d 590, 591 (Fla.App.1998).

36. Okl. Const. Art. II, § 7; *Crussel v. Kirk,* 1995 OK 41, ¶ 15, 894 P.2d 1116, 1120.

37. *Malone v. Malone,* 1979 OK 21, ¶ 4, 591 P.2d 296, 298.

38. *Kent v. United States,* 383 U.S. 541, 561, 86 S.Ct. 1045, 1057, 16 L.Ed.2d 84 (1966).

39. *Id.*

40. *Piette v. Bradley & Leseberg,* 1996 OK 124, ¶ 2, 930 P.2d 183, 183.

¶ 20 Because we reverse the trial court's order removing Venters as Towne's attorney on due process grounds, we need not consider here whether the record contains evidence sufficient to warrant his removal.[41]

### III

### SUMMARY

¶ 21 When in the course of a guardianship proceeding, the trial court engages in a statutory inquiry into the independence of a prospective ward's retained counsel, the examination must be conducted in compliance with the requirements of due process so as to safeguard the prospective ward's fundamental right to counsel of one's choice. "The right to counsel is not a formality. It is not a grudging gesture to a ritualistic requirement. It is of the essence of justice."[42] Due process was lacking in the conduct of the inquiry under review in this case. The trial court's order removing Venters as Towne's attorney must hence be reversed and the cause remanded for a new hearing.

¶ 22 TRIAL COURT'S ORDER REVERSED AND CAUSE REMANDED FOR FURTHER PROCEEDINGS TO BE CONDUCTED IN ACCORDANCE WITH THIS PRONOUNCEMENT

¶ 23 All Justices concur.

---

**41.** While we do not review the sufficiency of the evidence in this case, we note that the trial court's order of 5 January 1999 contains several statements of fact not reflected in the record on appeal. We surmise that this information came to the trial judge's attention during her first, off-the-record interview of Towne. For one to enjoy the opportunity of meaningful appellate review, another stage of proceedings protected by due process, it is essential that the facts relied upon by the trial court appear in a record that is available in one's quest for corrective relief.

**42.** *Kent v. United States, supra*, note 38 at 561, 86 S.Ct. at 1057.