107 Cal.Rptr.2d 542 (2001)
89 Cal.App.4th 675
CONSERVATORSHIP OF the Person and Estate of MARGARET L.
William A. Baker, Orange County Public Guardian, as Conservator, etc., Petitioner and Respondent,
v.
Margaret L., Objector and Appellant.
No. G026908.
Court of Appeal, Fourth District, Division Three.
May 31, 2001.
*543 Cheryl A. Geyerman, San Diego, and Peggy A. O'Neill, under appointment by the Court of Appeal, for Objector and Appellant.
Laurence M. Watson, County Counsel, Robert G. Overby and Laurie A. Shade, Deputy County Counsel, for Petitioner and Respondent.

OPINION
CROSBY, J.
When appointed counsel in a conservatorship appeal fails to discover an arguable issue, must the Court of Appeal independently review the record upon a request per People v. Wende (1979) 25 Cal.3d 436, 158 Cal.Rptr. 839, 600 P.2d 1071?[1]Yes.

I
A unanimous jury found Margaret L. gravely disabled, and the court extended her existing conservatorship.[2] We appointed an attorney to represent her on appeal, but counsel requested our independent Wende review after failing to identify an arguable appellate issue.
The evidence at trial came from forensic psychologist Stephen Wells and Margaret L. testifying on her own behalf in opposition to the continuation of her conservatorship. Wells, who has been Orange County's Chief of Mental Health Consultation for 19 years, personally examined Margaret L. on five occasions, beginning in 1993, but primarily in 1996 when her current conservatorship commenced. He also saw her about a week before trial at Beverly Manor, a locked-down long-term psychiatric rehabilitation facility. In addition, he reviewed her extensive medical records and consulted with her treating physician and others involved in her care, including a deputy public guardian.
Although Margaret L., age 46, is a college graduate in accounting, she has had approximately 20 psychiatric hospitalizations. In Wells's opinion she suffers from "schizoaffective disorder." He described the condition as "a combination of schizophrenic-type symptoms and symptoms like mania and depression." Her symptoms *544 include paranoid delusions and auditory hallucinations.
The present conservatorship began when police found Margaret L. wandering in traffic in a delusional state. Wells described her condition after hospitalization at that time: "She told various professionals, including myself, that her father and brother had been involved in the Watergate scandal. She also had the delusional belief that she was Peggy Sue and was being raped because of that. She claimed that John Fitzgerald Kennedy was her attorney. She said she had been involved in the Manson trial. She claimed that her family had forced her to be a child prostitute for the Kennedys. And again, she made additional charges of being molested and raped in a facility. [¶] This is one of the saddest and most difficult of the paranoid delusions. Ms. L[.] repeatedly believes that she's being raped, that has continued through the years. In every facility that she's been at she's reported people coming into her room to [rape her] at night."
In more recent years, Margaret L. believed that she had cured herself of AIDS by smoking cigarettes and drinking her own urine, her deputy public guardian was having an affair with one of her former husbands, her former employer was the CIA and it wanted to obtain her medical records, President Clinton wanted to harm her, her adoption of a female Japanese child was being frustrated by someone, and she had been raped by 18 Mafia dons. She also (incorrectly) believed she had an identical twinwho was harassing her conservatorand that her friends had abandoned her because they thought she murdered children and was the Antichrist. In addition, she was receiving telepathic communications from her parents who had not been otherwise in touch with her for years. The Mafia, she thought, intended to kill her family. Wells opined that Margaret L. is gravely disabled and cannot provide for her own clothing, food, and shelter, and that she would not take her numerous medications if she were set free.
In her testimony Margaret L. admitted she has had a mental illness for some 25 years, and she described it in terms similar to those employed by Wells. She stated she was taking five different medications and would continue to do so if released. She wished to go to Fredericksburg, Virginia where her older brother lives: "I think he would be able to take care of me." She denied having delusions, but stated it was true that the Mafia was going to kill her family. Margaret L. stated that she can cook, shop for groceries, clean house and wash her clothes.

II
In Conservatorship of Besoyan (1986) 181 Cal.App.3d 34, 38, 226 Cal.Rptr. 196, the court held, "Wende review is applicable where appointed appellate counsel has filed a brief on behalf of an LPS conservatee which raises no specific issues or describes the appeal as frivolous."[3] The court based its rationale on two lines of authority.
The first was headed by Conservatorship of Roidet (1979) 23 Cal.3d 219, 224, 152 Cal.Rptr. 425, 590 P.2d 1: "In effect, these statutes assure in many cases an unbroken and indefinite period of statesanctioned confinement. `The theoretical maximum period of detention is life as successive petitions may be filed....' (In re Gary W. (1971) 5 Cal.3d 296, 300, 96 *545 Cal.Rptr. 1, 486 P.2d 1201, italics added.)" Roulet predated Wende and involved a different issue, whether civil or criminal procedures should be applied in the trial of conservatorships. Notwithstanding the Probate Code's adoption of civil rules (Prob.Code, § 1000), the court held the potential loss of freedom required that the finding of grave disability be made on a reasonable doubt standard by a unanimous jury.[4] For reasons explained below, that part of the Besoyan foundation appears to be intact.
Besoyan's other rationale was that "... Wende review has been held applicable to certain civil proceedings dealing with the parent/child relationship, due to the fundamental nature of the rights involved...." There is no doubt that this analogous basis for the Besoyan holding has been eliminated. Our determination that Wende review was required in termination of parental rights cases based on an exhaustive examination of the law on the subject nationwide in In re Andrew B. (1995) 40 Cal.App.4th 825, 47 Cal.Rptr.2d 604 was rejected by the Supreme Court in In re Sade C, supra, 13 Cal.4th 952, 55 Cal.Rptr.2d 771, 920 P.2d 716.[5]
Although Sade C. recognized the existence of Besoyan in footnote 2, page 962, 55 Cal.Rptr.2d 771, 920 P.2d 716 (as well as Justice Mosk's supportive concurring and dissenting opinion in Conservatorship of Susan T., supra, 8 Cal.4th 1005, 1022-1023, 36 Cal.Rptr.2d 40, 884 P.2d 988), it did not directly disapprove of Besoyan. (After all, the issue of Wende review of conservatorship appeals was not specifically involved in the case.) Footnote 21 in Sade C. arguably does that, though. It states in part, "Insofar as any decision of ours or of the Courts of Appeal expressly or impliedly extends Anders beyond what is described in the text, it is disapproved." (In re Sade C, supra, 13 Cal.4th at pp. 993-994, fn. 21, 55 Cal.Rptr.2d 771, 920 P.2d 716; see also id., at pp. 983-984, fn. 13, 55 Cal.Rptr.2d 771, 920 P.2d 716.) This is the rule described in the text and repeatedly stated in Sade C: "... Anders's 'prophylactic' procedures have heretofore been limited in their applicability to appointed appellate counsel's representation of an indigent criminal defendant in his first appeal as of right. The United States Supreme Court established that limitation in Anders itself. It has reaffirmed it in its progeny." (Id. at p. 985, 55 Cal.Rptr.2d 771, 920 P.2d 716; see Pennsylvania v. Finley (1987) 481 U.S. 551, 556, 107 S.Ct. 1990, 95 L.Ed.2d 539.) Sade C. goes on to add this: "A fortiori, they [Wende/Anders] should not be applied ... outside the sphere of criminal law." (In re Sade C, supra, at p. 985, 55 Cal.Rptr.2d 771, 920 P.2d 716.)
Well, then, isn't that the end of the analysis? We do not believe so. Cases do not stand for questions not directly presented, or at least not directly answered, and Conservatorship of Roulet, supra, 23 Cal.3d 219, 152 Cal.Rptr. 425, 590 P.2d 1 is still good law, as is Lassiter v. Department of Social Sendees (1981) 452 U.S. 18, 26-27, 101 S.Ct. 2153, 68 L.Ed.2d 640 ("presumption that an indigent litigant has a right to appointed counsel only when, if he *546 loses, he may be deprived of his physical liberty," italics added).
A reasonable reading of Roulet is that a conservatorship proceeding, at least one that potentially implicates the loss of personal freedom of the proposed conservatee (compare Prob.Code, § 1801, subds. (a) ["conservator of the person"] and (b) ["conservator of the estate"]), is a criminal case for all practical purposes. Here is a pertinent part of the court's reasoning: "In criminal trials, proof of guilt beyond a reasonable doubt is an obstacle the state places in its own way, in order to lessen the possibility of convicting an innocent person. This procedural constraint is eloquent testimony to the high stakes involveda defendant's freedom and reputation hinge on the verdict. In People v. Burnick (1975) 14 Cal.3d 306, 319-322 [121 Cal.Rptr. 488, 535 P.2d 352], this court explicitly recognized that civil commitment to a mental hospital, despite its civil label, threatens a person's liberty and dignity on as massive a scale as that traditionally associated with criminal prosecutions. One has only to imagine the horror experienced by a competent person falsely committed as mentally disturbed in order to appreciate that freedom is openly on trial at a civil commitment proceeding. Therefore, the Burnick court ruled that proof beyond a reasonable doubt applies to mentally disordered sex offender proceedings. [¶] The logic of Burnick is equally applicable here. The appointment of a conservator for appellant and her subsequent confinement in a mental hospital against her will deprived appellant of freedom in its most basic aspects and placed a lasting stigma on her reputation." (Conservatorship of Roulet, supra, 23 Cal.3d at p. 223, 152 Cal.Rptr. 425, 590 P.2d 1.)
Moreover, Roulet flatly holds that the label is of no consequence: "[Respondent takes false comfort in the fact that appellant's commitment is only a `civil' confinement for remedial purposes. However, these are mere labels. Appellant's stay in Camarillo State Hospital was not any less involuntary because the state called her incarceration by one name rather than another. As the United States Supreme Court has authoritatively written, `commitment is a deprivation of liberty. It is incarceration against one's will, whether it is called "criminal" or "civil."` (In re Gault (1967) 387 U.S. 1, 50 [87 S.Ct. 1428, 1455, 18 L.Ed.2d 527, 558].) In a subsequent opinion, the Supreme Court reiterated that `civil labels and good intentions do not themselves obviate the need for criminal due process safeguards....' (In re Winship (1970) 397 U.S. 358, 365-366 [90 S.Ct. 1068, 1073, 25 L.Ed.2d 368, 376].) [¶] This court has also rejected reliance on a civil label." (Conservatorship of Roulet, supra, 23 Cal.3d at p. 225, 152 Cal.Rptr. 425, 590 P.2d 1.)
Finally, the court wisely refused to "be swayed by the fact that appellant had her liberty taken away, allegedly for her own good." (Ibid.) In the Roulet opinion, written at the height of the Cold War, the court may have been mindful of the practice of confining political dissidents in mental hospitals in the former Soviet Union: "`"Regardless of the purposes for which the incarceration is imposed, the fact remains that it is incarceration. The rehabilitative goals of the system are admirable, but they do not change the drastic nature of the action taken."` (Breed v. Jones (1975) 421 U.S. 519, 530, fn. 12 [95 S.Ct. 1779, 1786, 44 L.Ed.2d 346, 356].) The law must still strive to make certain that only those truly unable to take care of themselves are being assigned conservators under the LPS Act and committed to mental hospitals against their will." (Conservatorship of Roulet, supra, 23 Cal.3d at p. 225, 152 Cal.Rptr. 425, 590 P.2d 1.) *547 Wende review assists in achieving that goal.
Conservatorship of Susan T., supra, 8 Cal.4th 1005, 36 Cal.Rptr.2d 40, 884 P.2d 988 does not support the contrary result our dissenting colleague advocates for several reasons. There the issue was whether to apply the exclusionary rule in conservatorships, and the court concluded that would be a poor idea. But the court did note that the exclusionary rule could be appropriately applied in some non-criminal contexts where the purposes are similar, such as forfeiture proceedings. (Id. at pp. 1014-1015, 36 Cal.Rptr.2d 40, 884 P.2d 988.) And while the court stated that the purposes of the criminal law and conservatorship proceedings are entirely different (id. at p. 1015, 36 Cal.Rptr.2d 40, 884 P.2d 988), it specifically cited and reaffirmed the holding of Roulet: "The party seeking imposition of the conservatorship must prove the proposed conservatee's grave disability beyond a reasonable doubt and the verdict must be issued by a unanimous jury." (Id. at p. 1009, 36 Cal.Rptr.2d 40, 884 P.2d 988.) Thus, accuracy of result is of great importance in conservatorships, while deterring unlawful searches and seizures is not. Wende review goes to the accuracy of the proceedings and costs little by any measure. Reading Sade C, Susan T., and Roulet together, we must conclude Wende review is still required in conservatorships, at least those of the person.
Margaret L. was accused of no crime, but she faces severe stigma and even more disabilities than a convicted felon. Not only is her sentence potentially indeterminate, she has lost the power to manage her property (and she has some), to have a professional license, to drive, to vote and even the right to refuse consent to certain medical treatment. (Conservatorship of Roulet, supra, 23 Cal.3d at pp. 227-228, 152 Cal.Rptr. 425, 590 P.2d 1.) We did not find it too burdensome under these circumstances to expend two or three hours to review this sparse record for arguable issues. Such cases, after all, terrorize us with the prospect of extra work about as often as newly discovered asteroids threaten to collide with Earth.
Finally, we reject our dissenting colleague's view that Wende review of conservatorships is not an important safeguard merely because of the rarity of the need for it or the small likelihood of discovering an arguable issue. The gravity of the stakes for conservatees greatly outweighs those considerations.

III
We invited Margaret L. to file a brief on her own behalf, and she has not done so. Our review of the entire record discloses no reasonably arguable appellate issues. Substantial evidence supports the jury's findings and the trial court's order. Margaret L. was competently represented on this appeal. (See Conservatorship of Besoyan, supra, 181 Cal.App.3d at p. 38, 226 Cal.Rptr. 196.)
Judgment affirmed.
SILLS, P.J, concurs.
SILLS, P.J, Concurring.
I concur in the majority opinion in all respects. I write separately, however, to clarify the distinction between this case and In re Andrew B. (1995) 40 Cal.App.4th 825, 47 Cal.Rptr.2d 604.
Andrew B. held Wende review applied to the termination of parental rights in juvenile dependency cases, a conclusion with which I dissented and which the Supreme Court has rejected. (In re Sade C. (1996) 13 Cal.4th 952, 55 Cal.Rptr.2d 771, 920 P.2d 716.) As I explained, juvenile dependency cases are fundamentally different from criminal proceedings and do not need *548 Wende review to safeguard a parent's rights. "[T]he juvenile dependency system is itself a process which affects an ongoing outcome.... At virtually every point in the process, the law requires the child to be returned to his or her parents unless certain findings are made, [¶] California's juvenile dependency statutes constitute a remarkable system of checks and balances, facilitated by the availability of counsel for indigent parents. The potential for a miscarriage of justice that will escape the notice of any minimally attentive appointed appellate counsel is so low as to be practically nil." (In re Andrew B., supra, 40 Cal.App.4th at pp. 864-865, 47 Cal.Rptr.2d 604, dis. opn. of Sills, J.)
In juvenile dependency cases, a parent faces the loss of the relationship with his child. While this loss is potentially devastating, it is qualitatively different from the loss of physical liberty and the attendant loss of civil rights at stake in a conservatorship proceeding. I agree with the majority opinion that these consequences require the same prophylactic measure that Wende review affords to criminal defendants.
RYLAARSDAM, J., Concurring and dissenting.
I concur in the decision to affirm the trial court's judgment in this case. However, I respectfully dissent from the majority's conclusion an appellate court must conduct an independent review of the record in an appeal from a conservatorship proceeding under the Lanterman-Petris-Short Act (Welf. & Inst.Code, § 5000 et seq.; all further statutory references are to the Welfare and Institutions Code) if appointed counsel files a brief failing to raise any issues.
Under Anders v. California (1967) 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 and People v. Wende (1979) 25 Cal.3d 436, 158 Cal.Rptr. 839, 600 P.2d 1071, where an attorney appointed to represent an indigent defendant on appeal in a criminal case submits a brief summarizing the case's trial proceedings and facts and, although possibly referring to matters in the record which might arguably support the appeal, does not raise any specific issues, the appellate court must independently review the proceedings to determine whether it presents any arguable issues. (Anders v. California, supra, 386 U.S. at p. 744, 87 S.Ct. 1396; People v. Wende, supra, 25 Cal.3d at pp. 440, 442, 158 Cal.Rptr. 839, 600 P.2d 1071.) Conservatorship of Besoyan (1986) 181 Cal.App.3d 34, 38, 226 Cal. Rptr. 196 held independent review by the appellate court is also required where an indigent conservatee's appointed counsel files a similar brief.
However, In re Sade C. (1996) 13 Cal.4th 952, 55 Cal.Rptr.2d 771, 920 P.2d 716 held an appellate court's duty to independently review the record only applies to the first appeal of right by indigent criminal defendants, and refused to extend this requirement to indigent parents challenging adverse rulings in juvenile dependency proceedings, including orders permanently terminating parental rights. While Sade C. involved juvenile dependency appeals, the breadth of the Supreme Court's analysis of this question, plus the opinion's emphasis on limiting an appellate court's review obligation to criminal matters, leads me to conclude this duty no longer applies in appeals from conservatorship proceedings under the Lanterman-Petris-Short Act. Thus, Sade C. places Besoyan's holding in doubt.
First, it is important to note what this case is not about: the right to the assistance of counsel. Margaret L. had both a statutory and constitutional right to be represented by a lawyer. (§ 5365; Lassiter v. Department of Social Services (1981) *549 452 U.S. 18, 26-27, 101 S.Ct. 2153, 68 L.Ed.2d 640 [presumption of a right to counsel exists where an indigent litigant may be deprived of his or her physical liberty].) See also (Lessard v. Schmidt (E.D.Wis. 1974) 379 F.Supp. 1376 [due process denied in civil commitment proceeding by, inter alia, denial of counsel], vacated on other grounds in Schmidt v. Lessard (1975) 421 U.S. 957, 95 S.Ct. 1943, 44 L.Ed.2d 445, prior judg. reinstated on remand in Lessard v. Schmidt (E.D.Wis. 1976) 413 F.Supp. 1318; see also Heryford v. Parker (10th Cir.1968) 396 F.2d 393 [mentally deficient juvenile denied due process when not afforded legal counsel at hearing resulting in his involuntary commitment]; Towne v. Hubbard (Okla.2000) 3 P.3d 154, 159, fn. 18 [recognizing rule; citing cases]; In re Rapoport (N.Y.App. Div.1997) 239 A.D.2d 422, 657 N.Y.S.2d 748, 749 [counsel representing patient in involuntary commitment proceeding entitled to payment of fees].) The superior court appointed counsel to represent Margaret L. at trial, and we appointed an attorney to represent her in this appeal.
This case involves the question of whether a conservatee represented by appointed counsel is entitled to an appellate court's independent review of the proceedings as established by Anders v. California, supra, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 and extended by People v. Wende, supra, 25 Cal.3d 436, 158 Cal.Rptr. 839, 600 P.2d 1071 to independent review of the entire record. (See In re Kayla G. (1995) 40 Cal.App.4th 878, 882-886, 47 Cal. Rptr.2d 86.) In Sade C. the Supreme Court made it plainly clear the right to appointed counsel in and of itself did not trigger an appellate court's obligation to so review the record when appointed counsel failed to raise any issues. (In re Sade G, supra, 13 Cal.4th at pp. 982-985, fns. 11, 12, 13, 14, 55 Cal.Rptr.2d 771, 920 P.2d 716.)
Sade C. reviewed Anders extensively, including both its judicial antecedents and progeny, and reached the following conclusions: "First, Anders establishes certain procedures for state appellate courts that are `prophylactic' in nature. [Citations.] ... [¶] Second, Anders's `prophylactic' procedures are limited in their applicability to appointed appellate counsel's representation of an indigent criminal defendant in his first appeal as of right. [Citations.] ... [¶] Third, Anders's `prophylactic' procedures are dependent for their applicability on the existence of an indigent criminal defendant's right, under the Fourteenth Amendment's due process and equal protection clauses, to the assistance of appellate counsel appointed by the state in his first appeal as of right. [Citations.] ... [¶] Fourth, Anders's `prophylactic' procedures are designed solely to protect an indigent criminal defendant's right, under the Fourteenth Amendment's due process and equal protection clauses, to the assistance of appellate counsel appointed by the state in his first appeal as of right. [Citations.]" (In re Sade G, supra, 13 Cal.4th at pp. 977-978, 55 Cal.Rptr.2d 771, 920 P.2d 716.)
Sade C. did not expressly disapprove Besoyan. But in footnotes, the court twice declared "[i]nsofar as any decision of ours or of the Courts of Appeal expressly or impliedly extends Anders beyond what is described in the text, it is disapproved." (In re Sade C, supra, 13 Cal.4th at pp. 983-984, fn. 13; id. at pp. 993-994, fn. 21, 55 Cal.Rptr.2d 771, 920 P.2d 716.) Furthermore, Sade C. made it clear the right to independent review of the record by an appellate court applies only to criminal cases. `Anders's `prophylactic' procedures have heretofore been limited in their applicability to appointed appellate counsel's representation of an indigent criminal defendant in his first appeal as of right. The *550 United States Supreme Court established that limitation in Anders itself. It has reaffirmed it in its progeny. [¶] ... A fortiori, they should not be applied to such an entitlement outside the sphere of criminal law." (Id. at pp. 984-985, 55 Cal. Rptr.2d 771, 920 P.2d 716, fn. omitted. See also In re Kayla G., supra, 40 Cal. App.4th 878, 886, 47 Cal.Rptr.2d 86.)
The majority conclude conservatorship proceedings resulting in an involuntary commitment, such as here, should be treated as if they are criminal cases. However, the California Supreme Court has already rejected this approach.
In Conservatorship of Susan T. (1994) 8 Cal.4th 1005, 36 Cal.Rptr.2d 40, 884 P.2d 988, the court rejected a claim the exclusionary rule requiring the suppression of evidence seized in violation of the Fourth Amendment to the United States Constitution applies to conservatorship proceedings under the Lanterman-Petris-Short Act. In reaching this conclusion, the court noted prior decisions had applied the exclusionary rule to only those non-criminal proceedings, such as property forfeiture actions, embodying a close identity with the aims and objectives of criminal law enforcement. (Id. at pp. 1014-1016, 36 Cal.Rptr.2d 40, 884 P.2d 988.)
Susan T. concluded conservatorship proceedings served different objectives: "We find no similarity between the aims and objectives of the act and those of the criminal law. What we have said of commitment proceedings for the mentally retarded (§§ 6500-6513) is equally true of conservatorship proceedings under the act: `The commitment is not initiated in response, or necessarily related, to any criminal acts; it is of limited duration, expiring at the end of one year and any new petition is subject to the same procedures as an original commitment [citation]; the petitioner need not be a public prosecutor.... The sole state interest, legislatively expressed, is the custodial care, diagnosis, treatment, and protection of persons who are unable to take care of themselves and who for their own well being and the safety of others cannot be left adrift in the community. The commitment may not reasonably be deemed punishment either in its design or purpose. It is not analogous to criminal proceedings.' [Citations.]" (Id. at p. 1015, 36 Cal.Rptr.2d 40, 884 P.2d 988. See also Conservatorship of Baber (1984) 153 Cal. App.3d 542, 550, 200 Cal.Rptr. 262 ["A conservatorship proceeding is not a prosecution for a particular act, but an attempt to determine a condition which is subject to change"].)
The fact that a conservatee's involuntary commitment is similar to the incarceration of a criminal defendant has led the Legislature and courts to grant proposed conservatees some of the procedural safeguards accorded to criminal defendants. (See § 5365 [right to counsel], § 5350, subd. (d) [jury or court trial]; Conservatorship of Roulet (1979) 23 Cal.3d 219, 230, 152 Cal.Rptr. 425, 590 P.2d 1 [state's burden of proof is beyond a reasonable doubt; right to a unanimous jury verdict]; Waltz v. Zumwalt (1985) 167 Cal.App.3d 835, 838-839, 213 Cal.Rptr. 529 [free transcript of proceedings for purposes of appeal].)
But because a conservatee's commitment is different in purpose and duration from a criminal defendant's incarceration, differences exist that afford a conservatee rights not granted to a criminal defendant. For example, conservatorships under section 5350 last for only one year. (§ 5361.) During that time, a conservatee can petition for immediate release or for a modification of the conservatorship's terms. (§§ 5358.3, 5364.) Also, as happened in this case, conservatees who display improvement can receive day passes to temporarily *551 leave the facility where they are committed.
To extend the commitment beyond one year, the petitioning party must again prove beyond a reasonable doubt the conservatee is, at that time, gravely disabled. (§§ 5350, subd. (d), 5362; Conservatorship of Kevin M. (1996) 49 Cal.App.4th 79, 84, 56 Cal.Rptr.2d 765.) And, if requested, the conservatee is entitled to have the new proceeding tried before a jury. (§ 5365; Conservatorship of Benvenuto (1986) 180 Cal.App.3d 1030, 1037, 226 Cal.Rptr. 33.)
Conversely, other rights granted to criminal defendants do not apply to proposed conservatees. As noted, the exclusionary rule employed to remedy Fourth Amendment violations is inapplicable in conservatorship proceedings. (In re Susan T., supra, 8 Cal.4th at pp. 1017-1020, 36 Cal.Rptr.2d 40, 884 P.2d 988.) Unless an answer would be inculpatory, neither does the privilege against self-incrimination. (Conservatorship of Baber, supra, 153 Cal.App.3d at p. 550, 200 Cal.Rptr. 262 [proposed conservatee cannot refuse to testify]; Conservatorship of Mitchell (1981) 114 Cal.App.3d 606, 610-612, 170 Cal.Rptr. 759 [proposed conservatee cannot exclude statements obtained during a pre-commitment examination because of the absence of an admonition and waiver of his or her rights].) Nor does the double jeopardy doctrine preclude the state from seeking to establish a conservatorship subsequent to a prior adverse decision. (Conservatorship of Baber, supra, 153 Cal. App.3d at pp. 549-550, 200 Cal.Rptr. 262.)
Rather than seeking to analogize conservatorship proceedings to criminal prosecutions, a better approach is to determine whether requiring an appellate court to independently review the record is one of the procedural safeguards integral to maintaining the Lanterman-Petris-Short Act's delicate balance between treating sick people without legal delays and ensuring persons are not deprived of their liberties without due process of law. (Conservatorship of Kevin M., supra, 49 Cal. App.4th at p. 89, 56 Cal.Rptr.2d 765.) The sole benefit derived from the appellate court's independent review is ensuring appointed counsel "acts in the role of an active advocate in behalf of his client." (Anders v. California, supra, 386 U.S. at p. 744, 87 S.Ct. 1396; see also In re Sade C, supra, 13 Cal.4th at p. 992, 55 Cal. Rptr.2d 771, 920 P.2d 716.) Balanced against this sole benefit is the lost time and money, and most importantly, delay in entering a final decision. (In re Sade C, supra, 13 Cal.4th at p. 993, 55 Cal.Rptr.2d 771, 920 P.2d 716.)
Prior judicial experience implementing independent appellate review reflects this benefit is of minimal assistance to indigents. Sade C. described the chance that an erroneous result will occur in the absence of independent review by an appellate court as "negligible." (Id. at p. 990, 55 Cal.Rptr.2d 771, 920 P.2d 716.) This court and Division One of the Fourth Appellate District have described the results in juvenile dependency proceedings as "unproductive." (In re Kayla G., supra, 40 Cal.App.4th at p. 888, 47 Cal. Rptr.2d 86; In re Angelica V. (1995) 39 Cal.App.4th 1007, 1016, 46 Cal.Rptr.2d 295.)
In this context, I note the procedures for appointing appellate counsel has changed dramatically since Anders and Wende. The Courts of Appeal must now adopt procedures for appointing counsel. (See Cal. Rules of Court, rules 39.4(a), 76.5.) Guidelines have been promulgated establishing minimum requirements for attorneys representing indigents. (Cal.Stds.Jud.Admin, § 20.) To achieve these goals, all appellate districts in California have contractually assigned the rating and recommendation for appointment *552 of appellate counsel to independent project administrators. In addition, appointed counsel are now paid on an hourly basis. Thus, not only has there been a significant improvement in the quality of appellate representation for indigents, but the creation of an economic motive to discourage the routine filing briefs which find no arguable issues. (See In re Sade C, supra, 13 Cal.4th at p. 990, 55 Cal.Rptr.2d 771, 920 P.2d 716; In re Angelica V., supra, 39 Cal.App.4th at pp. 1014-1015, 46 Cal. Rptr.2d 295.)
As Sade C. recognized, "Procedures that are practically `unproductive,' like those in question, need not be put into place, no matter how many and how weighty the interests that theoretically support their use. To be sure, these procedures may have `symbolic' value of some kind. [Citation.] Such value, however, is too slight to compel their invocation." (In re Sade C, supra, 13 Cal.4th at pp. 990-991, 55 Cal. Rptr.2d 771, 920 P.2d 716, fn. omitted.) I would hold the procedural safeguards established by Anders and Wende do not apply in appeals from conservatorship proceedings brought under the Lanterman-Petris-Short Act.
NOTES
[1] Wende was the progeny of Anders v. California (1967) 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493, and Wende has recently been approved by the United States Supreme Court. (Smith v. Robbins (2000) 528 U.S. 259, 283-284, 120 S.Ct. 746, 763-764, 145 L.Ed.2d 756, 779.) While not identical approaches to the problem of monitoring indigent appeals where counsel fails to discover an arguable issue, the differences are not important here. Accordingly, for present purposes Anders and Wende may be referenced interchangeably.
[2] We abbreviate Margaret L.'s name to protect her privacy. (See Conservatorship of Susan T. (1994) 8 Cal.4th 1005, 1008, fn. 1, 36 Cal.Rptr.2d 40, 884 P.2d 988.)
[3] We solicited briefing on the continued vitality of Besoyan in light of In re Sade C. (1996) 13 Cal.4th 952, 55 Cal.Rptr.2d 771, 920 P.2d 716 and scheduled oral argument on our own motion.
[4] This court later ruled that a conservatorship could be terminated by a vote of nine of 12 jurors. (Conservatorship of Rodney M. (1996) 50 Cal.App.4th 1266, 1270-1272, 58 Cal. Rptr.2d 513.)
[5] "Rejected" is probably too mild a term. The Sade C. opinion literally seethes concerning Andrew B. (See Sade C, fns. 11, 12, 13, 14, 18, 19, 21, 22.) The author of that opinion stands by the soundness of its research and conclusion but, of course, must follow Sade C. (Auto Equity Sales, Inc. v. Superior Court (1962) 57 Cal.2d 450, 455, 20 Cal.Rptr. 321, 369 P.2d 937.)