Filed 7/26/23  Conservatorship of L.V. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| Conservatorship of the Person of L.V. | |
| PUBLIC GUARDIAN OF CONTRA COSTA COUNTY,<br><br>      Petitioner and Respondent,<br><br>v.<br><br>L.V.,<br><br>      Objector and Appellant. | A166065<br><br>(Contra Costa County<br>Super. Ct. No. MSP1501489) |

L.V. appeals an order reappointing a conservator of her person.  She contends the trial court erroneously admitted and relied on inadmissible hearsay evidence.  We shall affirm the order.

**FACTUAL AND PROCEDURAL BACKGROUND**

**I.  Petition and Trial**

The Director of the Contra Costa County Health Services Department (the County) filed a petition for reappointment of a conservator on February 17, 2022, alleging that L.V. was gravely disabled as a result of a mental disorder and was unable to provide for her basic personal needs for food,

clothing, and shelter.  (Welf. & Inst. Code, §§ 5361, 5362, 5363.)[1]  L.V. objected to the reappointment, and a court trial took place on May 31 and June 2, 2022.  There were two witnesses at trial, Dr. Jennifer Weinstein, a clinical psychologist who testified as an expert on behalf of the County, and L.V., who testified on her own behalf.

Over L.V.'s objection, the trial court admitted, as business records, redacted records from the facility in which L.V. was placed.  (Evid. Code, § 1271.)  The court explained that it had reviewed the records and saw no examples of hearsay from outside the facility and no diagnoses; however, it indicated that it would entertain further objections to specific portions of the records.

## II. Dr. Weinstein's Testimony

Dr. Weinstein interviewed L.V. twice, the first time on Zoom on May 24, 2022, a week before trial, and the second time in person on May 31, the first day of trial.

Based on her interviews with L.V., her review of L.V.'s records from the facility where she lived, and a conversation with a "team lead" at the facility, Dr. Weinstein diagnosed L.V. with schizoaffective disorder, which she described as a chronic disorder involving both a mood disorder and a psychotic disorder such as schizophrenia.

Schizophrenia, Dr. Weinstein testified, involves one or more of three "positive symptoms" (grossly disorganized speech or behavior, hallucinations, or delusions), and it also includes "negative" symptoms, such as low motivation, lack of appropriate emotional expression, lack of appropriate hygiene, isolation or socially inappropriate behavior, and poor room

---

[1] All undesignated statutory references are to the Welfare and Institutions Code.

2

cleanliness. The mood disorder portion of schizoaffective disorder may be manifested in low mood, hopelessness, helplessness, isolation, or bipolar disorder. Treatments for schizoaffective disorder are psychiatric medication, a structured program, training in socially appropriate behavior and proper hygiene, assistance with developing strategies to manage the symptoms, and group therapy.

L.V. was currently prescribed an anti-psychotic medication, Clozaril, and two antidepressant medications, Zoloft and Luvox, all of which are taken twice a day. She was also prescribed a medicine for agitation, Ativan.

*Interviews with L.V.*

Dr. Weinstein described the interview that took place on May 24, the week before trial. L.V. told Dr. Weinstein she had been living for nine years at the facility where she was currently placed. She was placed there because at her previous placement, which was an unlocked board and care home, she "fought someone, and didn't stop."

L.V. told Dr. Weinstein she wanted to go to a hospital because she was hearing voices, and she was experiencing "a pain in her back, and it [was] the pain of the voices." L.V. also said she had paranoia. L.V. said she was taking psychiatric medications and the facility gave her Ativan every morning.

During the interview, L.V. engaged in "inappropriate laughter," laughing suddenly without being able to explain the reason for doing so. She thought Dr. Weinstein was actually a person named Mariella who was posing as someone else.[2] L.V. looked away and appeared to be responding to internal stimuli, or "self-talking," rather than responding to what Dr. Weinstein said. She appeared confused and had difficulty understanding Dr.

---

[2] Here and at several other points during Dr. Weinstein's testimony, L.V. interjected to dispute statements she made.

3

Weinstein's questions, and she gave different answers to the same question during the interview. A few times during the interview she became agitated and began cursing. She exhibited mood shifts and a lack of emotional expression.

Dr. Weinstein asked L.V. about her plans. L.V. first said she wanted to go to the hospital to treat her psychosis. She later said she would rent an apartment. Dr. Weinstein asked how she would procure an apartment, and L.V. said she would borrow her sister's computer and look for one. She did not know what she would do if she could not find an apartment immediately. She said she had no income but had money in Mexico, but she was unable to provide any details about that money, becoming upset when Dr. Weinstein asked for more information.

There came a point during the May 24 interview that L.V. told Dr. Weinstein she was acting like the police and asking ridiculous and irrelevant questions, and L.V. did not answer any further questions.

Dr. Weinstein testified that when she interviewed L.V. on May 31, 2022, the first day of trial, L.V. laughed loudly; when Dr. Weinstein asked why she was laughing, L.V. said, " 'I'm laughing at myself' "; when she continued to laugh and was asked why, L.V. replied, " 'I'm talking to myself. I don't know what she said,' " and then said, " 'We—we—we,' " which Dr. Weinstein did not understand.

At the May 31 interview, Dr. Weinstein asked L.V. about what she planned to do if the court did not continue the conservatorship. L.V. first said she would go to her home and go to Mexico. When asked for details about where she would live and how she would get there, L.V. said, " 'I don't know, maybe Cancun.' " When asked if she had a place to live, she said, " 'I don't know.' " Dr. Weinstein asked if anyone was available to help her, and L.V.

4

relied, " 'Nobody helps me or believes me, so I don't care.' " Dr. Weinstein asked if L.V. could tell her anything more about her plan for taking care of herself, she replied, " 'No' " and said she did not know where to get her medications. Dr. Weinstein asked if L.V. would continue taking her medications when she left her current facility, she replied, "I don't know."

According to Dr. Weinstein, L.V. had difficulty engaging meaningfully with her in the May 31 conversation, and she showed no insight into her psychiatric condition. L.V.'s laughter was unpredictable and inappropriate to the conversation, and Dr. Weinstein viewed it as an example of socially inappropriate behavior and responding to internal stimuli. She had no explanation of L.V.'s meaning when she said, "We—we—we," and saw it as an example of disorganized speech and behavior.

Dr. Weinstein testified that based on her discussions with L.V. about her medications, she did not expect L.V. to be able to procure medications on her own. If L.V. stopped taking her medications, Dr. Weinstein would expect the symptoms of psychosis and depression to return.

She also testified that L.V.'s outbursts in court and persistence in interrupting the proceedings showed she had difficulty in controlling her impulses and understanding expectations for behavior, which can be symptoms of schizophrenia.

*Testimony Regarding L.V.'s Records*

Dr. Weinstein reviewed and testified about L.V.'s redacted records. On March 15, 2021, L.V. told her doctor she had a visit with her sister or sisters, but she could not recall her sister's name. She then said the sister who visited was an imposter and her real sister was in prison. According to the notes, L.V. said on the same date, " 'I don't have a family. My sister will do things to me,' " and she changed the topic abruptly, then said, " 'You guys are just

killing us here.'" These statements, Dr. Weinstein testified, demonstrated paranoid delusions, a symptom of schizoaffective disorder.

On February 14, 2022, according to the records, L.V. called the report writer "Amanda" and alleged she had only worked at the facility for one day. This statement, Dr. Weinstein testified, demonstrated L.V.'s confusion, paranoia, and lack of orientation to reality. The paranoid delusion that others were not who they said they were could make it difficult for a person to accept help or work with others.

A note from March 1, 2022 indicated that L.V. had poor personal hygiene and depended on prompts from staff members. Her room was not clean, and she left clothing soiled with urine and feces on top of her clean clothes.[3] Poor hygiene is a negative symptom of schizophrenia, and, in light of the fact that L.V. had a roommate, it was also inappropriate behavior. And, according to Dr. Weinstein, it demonstrated a lack of ability to follow basic social norms necessary for living independently.

The March 1, 2022 note also indicated that L.V. was on medication watch during February and that twice that month she refused to stay in the common area when reminded.[4] According to Dr. Weinstein, medication watch means patients must stay in staff's line of sight for 10 to 15 minutes after being administered medication; L.V.'s failure to do so indicated she did not consistently comply with medication rules.

Also on March 1, 2022, L.V. told staff members that she was at a psychiatric hospital when she was in Mexico and that the doctor there found she did not have a mental illness and prescribed only clozapine and Zyprexa; she said her sisters were the reason she was locked in a psychiatric hospital

---

[3] The trial court overruled L.V.'s hearsay objection to this evidence.

[4] The trial court overruled L.V.'s objection to this evidence.

6

and she called them " 'clowns.' " These comments, according to Dr. Weinstein, revealed L.V.'s confusion about her mental health diagnosis, lack of insight into her need for psychiatric care, suspiciousness of her providers, and paranoia toward her family. These symptoms would interfere with her ability to obtain psychiatric care, food, clothing, and shelter on her own.

A review covering the period from October through December 2021 indicated that during October L.V. was twice non-compliant with her medications despite prompts from staff, and on three occasions during November and December she did not comply with medication watch.[5] On December 11, 2021, a staff member saw L.V. talking and laughing with no one in close proximity throughout the day, which suggested to Dr. Weinstein she was responding to internal stimuli and which could indicate her judgment and ability to care for her own basic needs were impaired.

On January 6, 2022, staff noticed a pile of soiled clothes on her chair and mixed with her clean clothes in the dresser. Some of the clothes had feces on them.[6] According to the records, L.V. took a monitored shower on March 30, 2022, and had to be prompted twice to scrub properly and rinse her private area. These incidents indicated to Dr. Weinstein L.V.'s need for assistance with hygiene and daily living.

Based on her interviews with L.V., her conversation with a staff member, and L.V.'s records, Dr. Weinstein's opined that L.V. was presently gravely disabled.

---

[5] The trial court overruled L.V.'s objection to this evidence, made on the ground of multiple levels of hearsay.

[6] The trial court overruled L.V.'s objection, made on grounds of lack of foundation and hearsay because the notes did not indicate the author of the note personally saw the clothes.

### III.   L.V.'s Testimony

L.V. testified on her own behalf.  If she could leave her current facility, she would like to go to the board and care home at which she previously lived.  She would have the nurses at the board and care home give her medication and she would feel better there.  There were psychiatrists and social workers there, she would want the social workers' guidance, it was a good place, and she would be grateful to go there.  If she could not stay there, she would want to go to Mexico.[7]  If she did not have a conservator, she would go to her sister's house.

When asked what she would do if she were on her own rather than at the board and care home, she said she would wake up, take a shower, have breakfast, read a book, and take her medications morning and evening.  She thought it would be good to work with a psychiatrist.  When asked how she would pay for food and clothing if she did not have a conservator, she said her sister would take her to buy food and would bring clothing.  She said she could take care of her own hygiene and keep her room clean even if no one were telling her to do those things, and she noted she had her own apartment 12 or 13 years ago.

On cross-examination, L.V. said she had been diagnosed with bipolar disorder in Mexico and did not believe she had schizophrenia.  When asked about hearing voices, L.V. said her problem started when her brother, who had schizophrenia, started hearing voices, and L.V. said she "couldn't differentiate and I was traumatized."

---

[7] On cross-examination, however, when asked whether she recalled telling Dr. Weinstein she would live in Cancun if the conservatorship ended, L.V. responded, "I don't have any money to go to Cancun.  I would rather go to the beach in San Francisco."

## IV. Trial Court's Ruling

The trial court found L.V. was currently gravely disabled and reappointed the conservator. The court maintained her current placement but ordered a six-month placement status review to consider whether a board and care home would then meet her needs.

The order reappointing the conservator expired during the pendency of this appeal, as L.V. acknowledges, but the County does not argue the case is moot. Because this appeal raises issues that may recur yet evade review due to the relatively brief duration of a conservatorship, we consider it on the merits. (See *Conservatorship of Susan T.* (1994) 8 Cal.4th 1005, 1011, fn. 5; *Conservatorship of George H.* (2008) 169 Cal.App.4th 157, 161, fn. 2.)

## DISCUSSION

L.V. contends her records contained inadmissible hearsay and their admission prejudiced her.

In response, the County first argues that L.V. may raise on appeal only objections she made to specific parts of the records. (See *People v. Mattson* (1990) 50 Cal.3d 826, 853–854 [judgment reversed for erroneous admission of evidence only if specific ground of objection made at trial]; *People v. Boyette* (2002) 29 Cal.4th 381, 424.) Here, of course, L.V. objected to her records being admitted in their entirety, and she raised a number of specific objections during trial on grounds of hearsay and lack of foundation. The County does not identify any argument L.V. makes on appeal that is not fairly encompassed within her objections. We will consider her arguments on the merits.

The Lanterman-Petris-Short Act (§ 5000 et seq.) authorizes appointment of a conservator for a person who is "gravely disabled as a result of a mental health disorder." (§ 5350.) " '[G]ravely disabled' " means "[a]

9

condition in which a person, as a result of a mental health disorder, is unable to provide for his or her basic personal needs for food, clothing, or shelter." (§ 5008, subd. (h).) In determining whether a person is gravely disabled, it is appropriate to look to "the historical course of the person's mental disorder, as determined by available relevant information about the course of a person's mental disorder." (§ 5008.2.)

Our high court has ruled that when an expert testifies about case-specific out-of-court statements and treats them as true to support the expert's opinion, the statements are hearsay and are inadmissible unless each level of the hearsay falls within a hearsay exception. (*People v. Sanchez* (2016) 63 Cal.4th 665, 684 & fn. 11.) This rule applies to conservatorship proceedings. (*Conservatorship of S.A.* (2018) 25 Cal.App.5th 438, 448.) L.V.'s records were admitted under the business records exception to the hearsay rule.

The trial court has broad discretion to determine whether evidence is admissible under the business records exception. (*Conservatorship of S.A.*, *supra*, 25 Cal.App.5th at p. 447; see Evid. Code, § 1271.) This exception allows "[e]vidence of a writing made as a record of an act, condition, or event" if the writing is made in the regular course of a business, at or near the time of the act, condition, or event; if the custodian or another qualified witness testifies to its identity and mode of preparation, a requirement that may be satisfied by affidavit; and if the sources of information and time of preparation indicate its trustworthiness. (Evid. Code, §§ 1271, 1561; *S.A.*, at p. 447.) The records need not identify the individual who observed an event or recorded it. (*S.A.*, at p. 448 [records said " 'Per staff' "].)

Under California law, an "act, condition, or event" for purposes of the business records exception does not encompass conclusions such as diagnoses

10

of psychological conditions. (Evid Code, § 1271; *People v. Reyes* (1974) 12 Cal.3d 486, 503.) As our high court has explained, " ' "a conclusion is neither an act, condition or event; it may or may not be based upon conditions, acts or events observed by the person drawing the conclusion; it may or may not be founded upon sound reason; the person who has formed the conclusion recorded may or may not be qualified to form it and testify to it." ' " (*Ibid.*) Although a diagnosis of a physical condition such as a compound bone fracture may be admissible as a record of what the person who made the diagnosis saw, a psychiatric diagnosis is inadmissible because "it is based upon the thought process of the psychiatrist expressing the conclusion." (*Ibid.*)

L.V. contends the records introduced in this case violate these rules in several respects. Some portions of the records refer to L.V. being paranoid, and having paranoid delusions or ideations, and making bizarre and delusional statements. The records also refer to her, at various times, having a "good" mood or "[g]ood" group attendance, her personal hygiene and room care having "deteriorated" or being "poor," and her group participation being "[p]oor." They also refer to her having a "dysphoric and blunted" affect, having "chronically limited" judgment and insight, and having a "general attitude of indifference" toward her treatment. These statements, L.V. argues, are opinions rather than simple recitations of facts or conditions. She argues they thus do not fall within the scope of the business records exception and are inadmissible hearsay.

Some of the incidents related in the records are discussed in the portions of standard forms with headings for "Treatment Area[s]" that included "Positive Symptoms (to include delusions/hallucinations)"; "Oppositional/Defiant Behavior"; "Socially Inappropriate Behavior"; and

11

"Medication Non-Compliance."  These headings, L.V. argues, are improper expressions of opinion.

L.V. also argues that some of the incidents described in the records did not appear to take place at or near the time they were recorded and may not reflect observations by a person with the duty to report them accurately; for instance, some were found in quarterly reports summarizing L.V.'s behavior over the course of three months or refer to statements that L.V. made bizarre statements to "others, staff and residents."  L.V. makes other challenges to the evidence on this ground:  a psychiatric progress note stated that L.V.'s judgment was "chronically limited but ha[d] improved since her admission," and that her judgment about her disruptive behavior had improved.  The records also refer to L.V.'s "[g]oal[s]" without indicating whether these are goals she has set for herself or that have been set for her.  All of these portions of her records, L.V. argues, should have been redacted because they did not reflect acts, conditions, or events, or they were too remote in time to qualify for the business record exception.

We see no grounds to reverse on this basis.  First, the business records exception applies to " 'observed conduct,' " a category that is broad enough to allow evidence of such things as "threatening and aggressive" behavior. (*Conservatorship of S.A.*, *supra*, 25 Cal.App.5th at pp. 443, 448.)  Here, the trial court could properly treat references to such things as "paranoia," inappropriate or defiant behavior, and "poor" hygiene or group participation as observations of L.V.'s conduct.  And the sworn declaration accompanying S.A.'s records averred that the records were prepared by personnel at the facility, "either by hand or electronic input, in the ordinary course of business at or near the time of the act, condition, or event described in the records." (See *S.A.*, at pp. 447–448.)

12

In any case, even assuming some of the material was inadmissible hearsay, we apply the state law standard for prejudice to this question, reversing only if it is reasonably probable L.V. would have obtained a more favorable result absent the error.  (*Conservatorship of K.W.* (2017) 13 Cal.App.5th 1274, 1286; *People v. Watson* (1956) 46 Cal.2d 818, 836.)  Under this—or indeed any—standard, there was no prejudice.

We begin with the references to L.V.'s paranoia or delusions.  Whether or not they constitute conclusions rather than evidence of acts, conditions, or events (Evid. Code, § 1271), the record is replete with—and the references to paranoia in L.V.'s records are generally accompanied by—concrete examples of her behavior.  For instance, a reference to L.V.'s "paranoid ideations related to the idea of being discharged" is immediately followed with a description of L.V. saying that " 'you guys just keep us here forever to take my money.' "  An evaluator said L.V. "voice[d] some delusional content today," and immediately supported this statement by saying L.V. "addresses myself by a different name and states I have only been working here for one day."  A medical progress note said L.V. had "talked about various paranoid delusions regarding her sisters being kidnapped," and immediately explained L.V. said " 'they' " had kidnapped her sisters and would kill L.V.  Other portions of the records explained that L.V. displayed paranoia by refusing to sign reports and accusing staff of using her for her money, or that she made a delusional statement when she said that the doctor was not actually the doctor but someone else called Amanda.

Concrete examples similarly provide independent confirmation of the records' more general references to L.V.'s personal and room hygiene being poor.  Reference to her hygiene being " 'poor' " are supported by statements that she required staff prompts to shower and needed financial incentives to

13

take a shower, that she used toothpaste to wash her private area, that her bed often lacked linens, that she was bladder incontinent on numerous occasions, and that she left clothing soiled with urine and feces on top of her clean clothes.

As to the opinions Dr. Weinstein expressed, they were largely based on the effect of L.V.'s own actions and statements rather than on any statements in the records that L.V. challenges as inadmissible conclusions. For instance, Dr. Weinstein testified that L.V.'s statements that she was being kept in the facility for her money, that her sister was an imposter, and that her sisters were the reason she was locked in a psychiatric hospital were examples of paranoid delusions, a symptom of schizoaffective disorder. L.V.'s statement that a report writer had worked at the facility for only one day and was actually someone called Amanda was delusional and symptomatic of schizoaffective disorder. The opinion Dr. Weinstein expressed about L.V.'s difficulty following rules and regulations regarding medication was based on L.V.'s action in leaving the common area early while she was on medication watch.

Moreover, there is ample unchallenged evidence to support Dr. Weinstein's opinion, in the form not only of her direct observations during her interviews with L.V. but also of evidence in L.V.'s records, including hand-written notes indicating L.V. talked and laughed with no one in particular as if responding to internal stimuli; that she had soiled and clean clothes mixed together in her room; and that she had to be prompted to wash herself during a monitored shower.

In short, the portions of the records that L.V. contends are inadmissible pale in comparison to the ample unchallenged evidence that supports Dr. Weinstein's conclusion that L.V. is gravely disabled. There is no basis to

14

conclude either she or the trial court would have reached any other conclusion if the challenged statements had been redacted.

## DISPOSITION

The order is affirmed.

TUCHER, P.J.

WE CONCUR:

FUJISAKI, J.
PETROU, J.

*Conservatorship of L.V.* (A166065)